**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID A. RALEY,
        *Petitioner-Appellant,*

v.

EDDIE YLST, Acting Warden of the
California State Prison at San
Quentin,
        *Respondent-Appellee.*

No. 04-99008

D.C. No.
CV-93-02071-JW

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, Presiding

Argued and Submitted
February 16, 2006—San Francisco, California

Filed April 14, 2006
Amended November 30, 2006

Before: Barry G. Silverman, Susan P. Graber, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Graber

18847

**COUNSEL**

Robert D. Bacon, Oakland, California, for the petitioner-appellant.

Violet M. Lee, Deputy Attorney General, San Francisco, California, for the respondent-appellee.

**ORDER**

The opinion filed on April 14, 2006, slip opinion page 4145 and published at 444 F.3d 1085 (9th Cir. 2006), is amended by the opinion filed concurrently with this order.

With these amendments, the panel has voted to deny the petition for rehearing and petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc. A judge of the court called for a vote on whether to rehear the matter en banc. A majority of the nonrecused active judges failed to vote in favor of en banc rehearing.

The petition for rehearing and petition for rehearing en banc are DENIED. No further petitions for rehearing or petitions for rehearing en banc may be filed.

## OPINION

GRABER, Circuit Judge:

Petitioner David A. Raley was convicted in California state court, and sentenced to death, for the kidnap and first-degree murder of one victim and the kidnap, oral copulation by force, and attempted murder of a second victim. In this habeas petition, brought pursuant to 28 U.S.C. § 2253, he challenges his conviction on the grounds that he received ineffective assistance of counsel both at the trial and penalty phases and that the jury committed prejudicial misconduct by considering extrinsic evidence during sentencing. Additionally, he asserts that the district court erred in denying his request for an evidentiary hearing on his claim that the prosecutor failed to produce jail medical records to the defense as required under *Brady v. Maryland*, 373 U.S. 83 (1963). Because Petitioner received constitutionally sufficient assistance of counsel, because deliberations that are intrinsic to the jury process are not grounds for reversal, and because the records in question were not *Brady* material, we affirm.

## PROCEDURAL HISTORY

Petitioner was charged with the kidnap, attempted oral copulation by force, and first-degree murder of victim J.G. in violation of California Penal Code sections 207(a), 664-288a(c)(2), and 187, respectively. He also was charged with the kidnap, oral copulation by force, and attempted murder of victim L.M. in violation of sections 207(a), 288a(c)(2), and 664-187, respectively. A jury convicted him on all counts and found two special circumstances in relation to the murder of

J.G.: (1) murder in the commission of a kidnap, and (2) torture murder. The jury found that Petitioner used a deadly or dangerous weapon in murdering J.G. and that he used such a weapon and inflicted great bodily injury upon L.M.

The first penalty jury deadlocked. A second penalty jury sentenced Petitioner to death. During deliberations, the second penalty jury discussed Petitioner's decision not to testify, his possible eligibility for release if sentenced to life without parole, and the comparative costs of death and life sentences.

Petitioner pursued both a direct appeal and habeas relief through the state courts. On direct appeal, the California Supreme Court reversed Petitioner's conviction for attempted oral copulation of J.G. and affirmed the remaining convictions and the sentence. The California Supreme Court denied the habeas petition.

Petitioner then filed an original petition for habeas relief with the district court, before Congress passed the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The petition was stayed pending exhaustion of some claims at the state level and, ultimately, was denied on all grounds. The district court issued a Certificate of Appealability for four claims: ineffective assistance of counsel during the guilt phase, ineffective assistance during the penalty phase, jury misconduct, and competency to stand trial. Petitioner timely appealed all but the competency claim.[1]

## FACTUAL HISTORY

Petitioner does not challenge the state court's factual find-

---

[1]Petitioner asks us to grant a Certificate of Appealability on two additional issues. *See* Fed. R. App. P. 22(b) (governing appeals in habeas cases). We decline because Petitioner has not met the standards set forth in 28 U.S.C. § 2253(c)(2) and *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983).

ings. Thus, the findings of the California Supreme Court are presumed correct, 28 U.S.C. § 2254 (e)(1), and we summarize those findings here.

In 1985, Petitioner worked as a security guard at the Carolands Mansion in Hillsborough, California. Although the mansion was not generally open to the public, Petitioner occasionally gave unauthorized tours to young people. Witnesses who had taken such tours with Petitioner testified that he had asked them to go into certain rooms of the mansion and scream to show that the rooms were soundproof. He commented to one young woman that he could kill someone in the basement of the mansion and no one would hear any screams. Petitioner reportedly also made sexually suggestive comments to young women during these tours.

On Saturday, February 5, 1985, victims L.M. and J.G. came to Carolands Mansion. L.M. was 17 and J.G. was 16. Petitioner was on duty guarding the house. The girls asked Petitioner for a tour and he agreed, but on the condition that they park their car out of sight. They did so. During the tour, Petitioner told the girls that some guards received sexual favors in exchange for giving tours.

As the tour reached its conclusion, sounds were heard outside. Petitioner said that the police were there with training dogs and that the girls needed to hide or Petitioner would lose his job. He led them to a walk-in safe in the basement. The young women resisted entering the safe, but Petitioner insisted and promised that he would not close the door. They complied; he closed the door behind them.

After five minutes inside, the girls heard Petitioner calling L.M.'s name in a sing-song voice. He then told them that he would let them out of the safe, but only if they removed their clothes. He directed them to throw their clothes out of the safe when he opened the door. They came out of the safe wearing only their underwear. Petitioner handcuffed their hands

behind their backs. He was holding a large knife. He told them that they had to "fool around" with him for five minutes and then he would let them go.

He took them to a workroom and tied L.M.'s handcuffs to a rope that was already attached to the leg of a bench. He led J.G. away. L.M. heard her friend scream. Petitioner led J.G. back into the workroom 15 minutes later. She was dressed, but she appeared frightened and her lips and face were purple. Petitioner gave J.G. his coat and tied her to the workbench. He then led L.M. to another room, ordered her to remove her underwear, and told her to "kiss me and like it." She tried but could not comply. Petitioner told her to get onto her knees and unbuckle his pants. He then told her to "play with him" and "suck him." Again, she tried to comply but gagged when she touched her mouth to his penis. He demurred and ordered her to "play with him," instead. L.M. manually manipulated him until he ejaculated. Petitioner asked her to let him "come inside"; she refused.

Petitioner told L.M. he would let the two young women go but, if they told anyone what had happened, he would kill them. He then walked them to a door near the safe. J.G. asked to go first. Petitioner handcuffed L.M. to a door. L.M. heard noises after Petitioner and J.G. left and then saw the two running back toward her with Petitioner gripping J.G.'s arm. Petitioner told J.G. to wait there, and then he left. J.G. told L.M. that Petitioner had hit her with a club. Petitioner returned and again led J.G. away, leaving L.M. L.M. heard bumping noises and heard J.G. screaming. After 15 minutes of those noises, L.M. heard a dragging sound.

Petitioner then returned and pulled L.M. into the dark hallway, where he stabbed her in the abdomen. Petitioner stabbed L.M. 35 times and hit her with a club. He then rolled her into a carpet and dragged her out of the house and put her into the trunk of his car. J.G. was already in the trunk with her hands tied behind her back. She was bloody. The two remained in

the trunk for an estimated 2 hours before Petitioner began driving.

At some point during the course of events inside the mansion, a police officer, who was acquainted with Petitioner, arrived. He found the gates wired shut and the front door of the house locked. He sounded the horn in Petitioner's car and Petitioner came out of the house. The two discussed Petitioner's purchase of a citizen band radio.

After Petitioner had secured the two victims in the trunk of his car, Petitioner's supervisor arrived at the mansion. The relief guard had not yet arrived for his shift. Petitioner told his supervisor that he could not stay any later because he had an appointment with his father that evening. Soon thereafter, Petitioner drove away from the mansion.

Petitioner drove the two women to the house in which he lived with his father and sister. He parked the car in the garage and opened the trunk. He allowed both women to get out of the trunk to stretch their legs. He gave them a sleeping bag or a blanket because they complained of being cold. While Petitioner cleaned blood from the trunk, L.M. tried to engage him in conversation, but he was unresponsive. He did not answer her questions about what he was planning to do with them or whether he would take them to a hospital. He only gave her what she described as a "death stare." Petitioner then left the garage and returned with a rifle, which he pointed at L.M. He told her that if she did not remain quiet, "Bob" would kill her.

Upon hearing voices in the house, Petitioner placed the young women back into the trunk. He said that "Bob" had arrived and that he would try to convince "Bob" not to kill them. Petitioner went into the house. He refused to eat dinner, saying that he was not feeling well. But he watched television with his sister and then played a game of Monopoly with her that lasted until 11 p.m. Later in the night, Petitioner had a

conversation with his father about cleaning the garage and talked with some friends about their new car stereo.

At some point in the night, L.M. awoke and felt the car moving. Petitioner stopped the car several times along the way until he made his final stop at a remote location. He opened the trunk. He removed J.G. and threw her down a ravine. Then he removed L.M., beat her around the head and neck with a club 10 or 11 times, and threw her down the ravine with her hands still tied. She rolled next to J.G. The two women remained in the ravine until daybreak. In the morning, L.M. managed to crawl up the hill and find help. One of the rescuers tried to administer first aid but thought that the wounds were too numerous and severe for his skills. The two women were taken to the emergency room. J.G. bled to death during surgery.

Defendant presented evidence at trial showing that he was not the only guard at Carolands who gave tours of the mansion and that he had given tours to young men, not just to young women. He also presented the expert testimony of a physician who opined that J.G. received improper medical treatment at the emergency room and that the improper treatment may have led to her death.

Lawyer Bryan Shechmeister represented Petitioner during the guilt phase of his trial. Shechmeister consulted three psychiatric experts in preparation for trial: Drs. Spiegel, French, and Livingston. He gave each doctor a brief summary of Petitioner's life history. Each doctor interviewed Petitioner and provided an opinion to Shechmeister. Shechmeister decided not to present a psychiatric witness during the guilt phase.

Shechmeister represented Petitioner for the first penalty trial as well, assisted by lawyer Mary Yale. Counsel did not call a psychiatric expert at the first penalty trial, either. However, counsel did present Petitioner's father and sister, who testified to the abuse that Petitioner suffered, both as a child

and into adulthood, at the hands of his mother. The first penalty jury deadlocked, and the court declared a mistrial.

Mary Yale alone represented Petitioner at the second penalty trial. Before the second trial, Yale interviewed the members of the first jury and reinterviewed Dr. Spiegel. She, again, decided against calling an expert psychiatric witness.

Instead, Yale first presented several young people who testified to uneventful tours that they had received from Petitioner at Carolands before the February 5 incident. One witness testified about another security guard who had frightened her during a tour and had invited her and her friends to return during the night for a "party" at the mansion. In support of the theory that J.G.'s death resulted from poor medical treatment at the hospital, Yale called the rescuing paramedics who testified that the two victims were both conscious and alive when the paramedics answered the rescue call and that J.G.'s blood pressure was stronger than L.M.'s at that time. Two women, who were acquainted with Petitioner because he frequented the strip club in which they worked, testified that Petitioner was kind and protective toward women and that he was a caring, quiet, and lonely individual. Yale also called Petitioner's sister and father. They testified that Petitioner's mother was an alcoholic who had been emotionally and physically abusive to him. Finally, a police officer testified to Petitioner's cooperation during his arrest and to his admission of culpability. A tape of Petitioner's confession to the police was played for the jury to demonstrate his distress over his acts.

## STANDARD OF REVIEW

Because Petitioner filed his original habeas petition in the district court before the effective date of AEDPA, the provisions of AEDPA do not apply. *Alcala v. Woodford*, 334 F.3d 862, 868 (9th Cir. 2003). We review de novo a district court's denial of a petition for a writ of habeas corpus. *McNeil v.*

*Middleton*, 344 F.3d 988, 994 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 433 (2004) (per curiam).

## DISCUSSION

### A.  *Ineffective Assistance of Counsel*

Petitioner argues that he received ineffective assistance of counsel at both the guilt phase and the penalty phase because his lawyers decided not to present expert testimony in support of a mental defect defense. To prevail on a habeas claim of ineffective assistance of counsel, Petitioner must establish *both* (1) that counsel's performance was so deficient that it fell below an "objective standard of reasonableness" *and* (2) that the deficient performance rendered the results of his trial unreliable or fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

### 1.  *Counsels' Performance*

In analyzing the performance of counsel, judicial scrutiny is deferential. "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. The burden is on Petitioner to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.*

Petitioner argues that his lawyers provided ineffective assistance during both the guilt and the penalty phases because they failed to develop fully, and to offer, expert evidence to support a mental defect defense or a mental impairment as a mitigating factor at sentencing. On this record, we are not persuaded.

[1] A defense lawyer must make reasonable investigations in the course of representation. *Strickland*, 466 U.S. at 691.

Counsel's investigation must, at a minimum, permit informed decisions about how best to represent the client. *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994). However, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. A disagreement with counsel's tactical decisions does not provide the basis for declaring that the representation was constitutionally deficient. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981) (per curiam).

### a.  *Guilt Phase*

Petitioner's trial counsel, Shechmeister, consulted three mental health experts in preparation for Petitioner's trial: Drs. Alfred French, David Spiegel, and James Livingston. Petitioner does not challenge their *qualifications*, nor the *selection* of these three individuals to render opinions to the defense. Each expert interviewed Petitioner once. All three experts reported their results and opinions to Shechmeister before the guilt phase trial began. After reviewing the expert opinions, Shechmeister decided against calling any mental health expert at trial.

From the record, it appears that Dr. French administered the Rorschach Test and the Minnesota Multiphasic Personality Inventory ("MMPI") during his evaluation and also conducted a broader interview of Petitioner. Dr. French reported the MMPI results as "suggesting Major Depression with Psychotic Features and Schizophrenia, Paranoid Type, with superimposed affective [disorder] as probable Axis I diagnosis and no probable Axis II diagnosis." His interview revealed evidence suggesting the possibility that Petitioner suffered from Multiple Personality Disorder and recommended further investigation into this possibility, including hypnosis of Petitioner, if possible. The Rorschach Test indicated "depression and poor ego boundaries, a sense of passivity about his situation, eccentric behavior and a basic conflict concerning his

interpersonal relationships." But Dr. French made no definitive diagnosis.

Dr. Spiegel examined Petitioner after Dr. French had done so. Dr. Spiegel did not use standardized psychiatric tests, but he did evaluate Petitioner's hypnotizability and determined that it was "moderate at best." Dr. Spiegel did not opine that Petitioner suffered from Multiple Personality Disorder or any other diagnosable mental defect. Dr. Spiegel believed that Petitioner did not experience sexual excitement during the attack. He suggested that Petitioner's actions were related to, and a result of, the parental abuse that he had suffered. He recommended that Petitioner be subjected to a "traditional psychiatric examination" to rule out psychosis and potentially to diagnose an Axis II personality disorder.

Notes of Dr. Spiegel's findings contain a number of statements that could have damaged Petitioner's case. For example, Dr. Spiegel's evaluation stated:

> **D[efendant] does not have the type pattern of a psychopath. D was able to control himself — control the outward signs of his illness. D was making a choice in a sense — he knew what he was doing was wrong.**

> Is D treatable? "Don't send him to me." **D is *dangerous* — may be dangerous to the therapist.** D is not motivated toward therapy, inside himself he does not feel the desire to change.

> D is *unpredictable* — **he did not plan to do this when he went to the mansion. No signs to see the violence coming. No way to predict when this will happen *again*.**

> D played/cheated at monopoly while V[ictim]s in car bleeding: *CALLOUS*.

Shechmeister also retained Dr. Livingston, who conducted a battery of standardized psychiatric tests. The record indicates only that Dr. Livingston diagnosed Petitioner as a "sexual psychopath."

Petitioner argues that our precedents require a finding of ineffective assistance of counsel because Shechmeister presented a mental defect argument to the jury without the support of expert testimony. Petitioner cites *Bloom v. Calderon*, 132 F.3d 1267 (9th Cir. 1997), and *Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002). Those cases demonstrate that, to provide adequate representation of a criminal defendant who may suffer from a mental defect, counsel must conduct a reasonable investigation into such a defense. In each of the cited cases, counsel conducted either no investigation at all, or a blatantly minimal investigation. *See Bloom*, 132 F.3d at 1271-77 (holding that counsel was ineffective where he failed to retain a mental health expert until days before trial, delegated preparation of the expert to an assisting law student, and failed to uncover evidence of the defendant's lengthy history of severe abuse, family history of mental illness, and the defendant's own then-recent diagnosis of mental illness); *see also Jennings*, 290 F.3d at 1013-15 (setting out an extensive list of the reasonable steps the defendant's counsel failed to take to investigate a possible mental defect defense and noting that counsel "claims he did not conduct any investigation into possible mental defenses because he had settled early on an alibi defense").

**[2]** In sharp contrast, the investigation that Shechmeister conducted was reasonable and careful. He retained not one, but three, mental health experts, each of whom interviewed Petitioner and provided a report in advance of trial. In the light of the equivocal evidence provided by the three retained experts, counsel's decision not to call an expert witness during the guilt phase was a reasonable strategic decision.

Petitioner argues that Shechmeister's reliance on the expert reports cannot be credited as a valid strategic decision,

because Shechmeister failed to provide them with enough information about Petitioner's childhood to support an informed expert opinion. We disagree. It is undisputed that Shechmeister gave the three experts basic background information about Petitioner. Both Drs. French and Spiegel testified in depositions that they knew that Petitioner had been abused by his mother, and there is no evidence that either doctor requested additional life history information. The experts interviewed Petitioner and thus had an opportunity to question him directly about his childhood. Additionally, during the habeas proceeding both doctors were given an exhaustive report regarding Petitioner's history. Neither said that the additional information would have changed his expert opinion significantly.

[3] In summary, Shechmeister conducted a reasonable investigation and made a reasonable strategic choice not to present expert testimony regarding a mental defect claim. Consequently, we reject Petitioner's claim of ineffective assistance of counsel as to the guilt phase.

### b. *First Penalty Trial*

Petitioner argues that Shechmeister provided ineffective assistance during the first penalty trial by failing to offer a mental health expert to present mental impairment evidence as mitigation. We need not address the performance prong of *Strickland* here. Petitioner clearly failed to demonstrate prejudice as the first penalty trial resulted in a hung jury.

### c. *Second Penalty Trial*

Petitioner likewise argues that he received ineffective assistance of counsel from lawyer Mary Yale during the second penalty trial because Yale, too, decided against presenting a mental health expert witness. We hold that Yale's decision was a valid strategic choice warranting judicial deference.

In the context of assessing mental impairment evidence, "[w]e have repeatedly held that counsel may render ineffective assistance if he 'is on notice that his client may be mentally impaired,' yet fails 'to investigate his client's mental condition as a mitigating factor in a penalty phase hearing.' " *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002) (quoting *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995)). We have recognized a defendant's right to habeas relief in cases where counsel failed to investigate mitigating mental health evidence adequately. *See id.* at 1255 (holding that counsel was ineffective where he knew of the defendant's lifelong exposure to toxic pesticides but failed to retain any expert to assess potential brain damage); *see also Deutscher v. Whitley*, 884 F.2d 1152, 1159 (9th Cir. 1989), *judgment vacated on other grounds*, 500 U.S. 901 (1991) (holding that counsel was ineffective where he conducted *no* investigation into the defendant's psychiatric history even though health records revealed that the defendant had been born prematurely and had been diagnosed with mental illness).

**[4]** By contrast, Yale conducted a reasonable investigation into Petitioner's mental condition. She had assisted Shechmeister during Petitioner's first penalty trial. She therefore had the benefit of his earlier preparations, including his consultations with three mental health professionals, and she knew that the first penalty trial successfully avoided the imposition of the death penalty without an expert on the defense side.

In preparation for the second penalty trial, Yale discussed with Shechmeister the findings and opinions of the three retained experts. Yale also reinterviewed Dr. Spiegel twice and provided him with additional background information related to aggravation evidence that the prosecution planned to offer during the penalty retrial. Additionally, she interviewed the jurors from the first penalty trial, seeking insight into their perspectives on the strengths and weaknesses of the defense's case.

**[5]** After this additional investigation, and given Shechmeister's success in attaining a hung jury without the use of expert testimony, Yale decided to continue to rely on the lay testimony of Petitioner's father and sister as the means of informing the jury of Petitioner's history of abuse. Yale, like Shechmeister, conducted a reasonable investigation and made an informed tactical decision not to present expert testimony. Thus, we reject Petitioner's claim of ineffective assistance of counsel as to the second penalty trial.

## 2. *Prejudice*

**[6]** Even if we were persuaded that counsel performed ineffectively, we would have to conclude that Petitioner failed to show prejudice. As we have noted, in order to prevail on a claim of prejudice, Petitioner must demonstrate that counsels' failure to call expert witnesses rendered the results of his trial unreliable or fundamentally unfair. *Strickland*, 466 U.S. at 694. The bar for establishing prejudice is set lower in death-penalty sentencing cases than in guilt-phase challenges and noncapital cases. *See Deutscher*, 884 F.2d at 1161 (stating that "we must be especially cautious in protecting a defendant's right to effective counsel at a capital sentencing hearing"). Even in the context of a challenge to a death sentence, however, Petitioner must show that it is reasonably probable that the outcome would have been different had counsel performed adequately. *Strickland*, 466 U.S. at 694.

**[7]** Here, Petitioner's mental defect defense was based on the physical and emotional abuse that he suffered throughout his childhood and into adulthood, primarily at the hands of his alcoholic mother. The jury heard evidence of that abuse. Petitioner's father and sister both testified to the history of abuse within the Raley home. *Cf. Deutscher*, 884 F.2d at 1161 (finding prejudice where defense counsel failed to present any mitigating evidence at all).

Petitioner argues that the absence of an expert to explain the link between abusive treatment and Petitioner's subse-

quent mental state requires a finding of prejudice. He points to the fact that, during deliberations, the second penalty jury sent a note to the judge asking whether psychiatric evidence was available. This argument is unavailing for three reasons.

First, as we have explained, none of the three experts retained by defense counsel conclusively opined that Petitioner had a mental defect. Second, the experts' reports contained damaging content that would have come to light through cross-examination and, on balance, would have hurt more than helped. Third, the link between suffering abuse as a child and later committing abusive acts is not so esoteric as to be beyond the understanding of a lay jury. *Cf. Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) (noting the need for expert testimony to explain a possible causal connection between the defendant's exposure to toxic pesticides and aggressive behavior because an understanding of that kind of link is not within the common knowledge of lay persons).

**[8]** Given the fact the jury heard detailed factual evidence of Petitioner's history of abuse, given the equivocal nature of the expert evidence available to defense counsel, and given the grim facts of the crimes themselves, there is no reasonable probability that Petitioner would have escaped the death penalty had counsel presented expert testimony at sentencing.

B.   *Jury Misconduct*

Petitioner argues that his death sentence must be overturned because the penalty jury considered constitutionally forbidden topics during sentencing. Petitioner submitted the depositions of two jurors who testified that, during deliberations, the jury considered Petitioner's decision not to testify, his possible eligibility for release if sentenced to life without parole, and the comparative costs of death and life-without-parole sentences.

**[9]** The Sixth Amendment's guarantee of a trial by jury requires that the jury base its verdict on the evidence pre-

sented at trial. *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965). A jury's exposure to extrinsic evidence deprives a defendant of the rights to confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment. *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995). "Evidence not presented at trial, acquired through out-of-court experiments or otherwise, is deemed 'extrinsic.' " *United States v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991) (citing *Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir. 1987)).

**[10]** The fact that Petitioner did not testify in his own defense is not extrinsic evidence. *United States v. Rodriquez*, 116 F.3d 1225, 1226-27 (8th Cir. 1997). Although the jury's discussion of this issue clearly violated the trial court's instructions, what happened (or did not happen) in the courtroom was a part of the trial, not extrinsic to it. We may not inquire into a jury's deliberations concerning the evidence at trial. *Belmontes v. Brown*, 414 F.3d 1094, 1124 (9th Cir. 2005), *rev'd on other grounds*, *Ayers v. Belmontes*, 2006 WL 3257143 (U.S. Nov. 13, 2006) (No. 05-493).

**[11]** The jury's discussion of the practical effect of imposing a sentence of life without parole also does not constitute reversible error. In *Belmontes*, we held that a death penalty jury's consideration whether a sentence of life without parole would actually keep the defendant in jail for life was part of the "intrinsic jury processes" and not a ground for reversal. *Id.* Although we did not, in *Belmontes*, directly address the related issue of considering the sentences' comparative costs, the same logic and the same holding apply.

## C.   Brady *Claim*

Petitioner argues that the prosecution violated his right to due process under *Brady*, by failing to disclose exculpatory and mitigating evidence contained in Petitioner's medical records from his pretrial confinement at the Santa Clara

County Jail, and that the district court erred in denying him an evidentiary hearing on this claim.

**[12]** *Brady* holds that the prosecution violates a defendant's due process rights if it fails to turn over evidence that is "material either to guilt or to punishment." 373 U.S. at 87. In order to prevail on a *Brady* claim, a defendant must demonstrate that: (1) the evidence at issue is favorable, either because it is exculpatory or because it is impeaching; (2) such evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice resulted. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Nonetheless, "where the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a *Brady* violation by not bringing the evidence to the attention of the defense." *United States v. Brown*, 582 F.2d 197, 200 (2d Cir. 1978); *see also United States v. Dupuy*, 760 F.2d 1492, 1501 n.5 (9th Cir. 1985) (citing *Brown*).

**[13]** In this case, Petitioner possessed the salient facts regarding the existence of the records that he claims were withheld. Petitioner knew that he had made frequent visits to medical personnel at the jail. He knew that he was taking medication that they prescribed for him. Those facts were sufficient to alert defense counsel to the probability that the jail had created medical records relating to Petitioner. Because Petitioner knew of the existence of the evidence, his counsel could have sought the documents through discovery. *See, e.g., United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983) (per curiam) (holding that the prosecutor did not violate *Brady* by failing to turn over statements by government witnesses where the defendant had access to a list of potential government witnesses).

AFFIRMED.