NGUYEN, Circuit Judge, concurring in part and dissenting in part: In January 1981, Francis Hernandez brutally raped, sodomized, strangled to death, and mutilated Edna Bristol, throwing her naked body out of his van near a middle school in Long Beach, California. Five days later, and in a strikingly similar manner, Hernandez raped and killed Kathy Ryan, throwing her naked body on the lawn of a high school in the same city. After his arrest, Hernandez gave a comprehensive, graphic, and disturbing confession, walking the police through the details of his gruesome criihes and, importantly, his thoughts, anger, and awareness of his actions as he committed them. His admissions, along with substantial physical evidence connecting him to the crimes, amply supported the jury’s guilty verdicts. Yet despite the strength of the evidence, the majority now vacates Hernandez’s first degree murder convictions on the ground that Hernandez suffered prejudice due to trial counsel’s deficient performance. I strongly disagree. Even if the jury had considered the omitted evidence of Hernandez’s mental condition, there is no reasonable possibility of a different outcome. It’s not even a close call. The evidence that Hernandez had specific intent to rape and kill, either of which could have independently supported the verdicts, was so overwhelming that no rational juror would have believed otherwise. I dissent. I. In order to prevail, Hernandez must show a “reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is' a probability sufficient to undermine confidence in the outcome.” Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (emphasis added). To determine if there is a reasonable probability of a different outcome, we compare “the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently.” Clark v. Arnold, 769 F.3d 711, 728 (9th Cir. 2014) (quoting Murtishaw v. Woodford, 255 F.3d 926, 940 (9th Cir. 2001)). While a reasonable probability is “less than the preponderance more-likely-than-not standard,” Summerlin v. Schriro, 427 F.3d 623, 640 (9th Cir. 2005) (en banc) (citing Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052), “[i]t is not enough ‘to show that the errors had some conceivable effect on the outcome of the proceeding!;,]’ ” Harrington v. Richter, 562 U.S. 86, 104, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (quoting Strickland, 466 U.S. at 693, 104 S.Ct. 2052). Hernandez faces a higher burden of showing prejudice at the guilt phase than at his death penalty sentencing, where prejudice has been established without appeal by the government. See Raley v. Ylst, 470 F.3d 792, 802 (9th Cir. 2006) (“The bar for establishing prejudice is set lower in death-penalty sentencing cases than in guilt-phase challenges and noncapital cases.”). .Hernandez also must show a reasonable probability of a different outcome as to both first. degree murder theories that were available to the jury: 1) willful, deliberate, and premeditated murder,, and 2) felony murder with rape as the predicate felony. That is because, as the majority acknowledges, the jury was presented with two independent paths to first degree murder. While the jury was required to find that the killing was willful, deliberate, premeditated and with malice aforethought under the first theory, it needed only to find that Hernandez had the specific intent to rape under the second theory of felony murder. See People v. Hernandez, 47 Cal. 3d 315, 346-47, 348-51, 253 Cal.Rptr. 199, 763 P.2d 1289 (1988). II. A. The Jury Heard Overwhelming Evidence of Hernandez’s Specific Intent to Rape and Kill both Bristol and Ryan Ample evidence of Hernandez’s specific intent to rape, and kill both Bristol and Ryan supported the jury’s verdict. First, the two crimes were committed within days of each other and were strikingly similar, strongly suggesting premeditation. Bristol and Ryan were around the same age—21 and 16, respectively—and both had shoulder-length blonde hair and similar body types. Hernandez, 47 Cal. 3d at 328, 341, 253 Cal.Rptr. 199, 763 P.2d 1289. Both women were enticed into Hernandez’s van, raped, and sodomized. Hernandez taped Bristol’s wrists, ankles, and mouth with duct tape; tape was also found near Ryan’s body. Id. at 328, 253 Cal.Rptr. 199, 763 P.2d 1289. According to pathologist testimony, each victim was subjected to “extremely similar and extremely rare” wounds to the vagina and anus, likely caused by forcible insertion of a large object, possibly a baseball bat. After each woman struggled and screamed, Hernandez strangled each of them. Both women were found in the early morning hours, their bodies abandoned near schools on grassy parkways. Their bodies bore other similar injuries—wounds inflicted by punches to the mouth, significant bruising around their necks, bite marks on their breasts, “puncture-wound type injuries to the nipples,” and “singed or burned pubic hair.” The injuries “carried significant sexual overtones,” and “specifically sexual violence [was] repeated in almost every detail with both victims.” Id. at 350, 253 Cal. Rptr. 199, 763 P.2d 1289. Both women were found naked and lying on their backs, and Hernandez threw both of their clothes out of his van after driving away from their bodies. The substantial similarities between the crimes showed that Hernandez intended and premeditated both rapes and murders. Cf. id. at 341, 253 Cal.Rptr. 199, 763 P.2d 1289 (characterizing the offenses as “‘signature’ crimes—because of the unique nature of each killing it was reasonable to believe the same person committed them both”). Second, Hernandez’s own words during his confession showed his intent. He explained the beginning of his attack on Bristol as follows: [Bristol] started telling me about all her problems, and I was mad, and I told her not to tell me about her problems, and then she started bitching, and I just stopped my van.[1] I got out, walked around and told her to get out, and she wouldn’t get out, so I hit her, and I dragged her out of my van, and then she told me that she’d do anything, and I thought about that for a minute, and - I don’t know it was just that I was drunk and I was in a weird mood, and I just took her and I threw her in the back ... and then I told her to get out and get in the front ... and I proceeded to drive ... on the Long Beach Freeway[.] (Emphasis added.) Hernandez then parked at a separate location and told Bristol to “get in the back” and “to take off her clothes.” There was no exit from the back of the van, as a passenger would have to climb through the driver’s side door to get out of the vehicle. Hernandez, 47 Cal. 3d at 345 n.18, 253 Cal.Rptr. 199, 763 P.2d 1289. Hernandez described what happened next: [S]he did, she was willing, and sat there, [we] had sexual intercourse once, then I was getting up and getting ready to let her go, and I didn’t really have her— you knoio—forcibly. I guess maybe she thought I did but I don’t knoio—you know. I proceeded to get up and get my clothes on, and I was going to let her out. (Emphasis added.) While Hernandez tried to minimize his conduct by claiming that they had consensual intercourse, his statement reveals, in several respects, his awareness of Bristol’s lack of consent and his specific intent to rape her—pondering her plea that she would “do anything;” driving to a different location; ordering her to get into the back of the van and take off her clothes; and, after raping her, admitting that he was preparing to “let her go” or “let her out.” Tragically, Hernandez’s violence only increased as the evening progressed. Bristol struggled against Hernandez, kicking him and kicking a hole in the door of his van. This made Hernandez go “bezerk,” and, in his own words: I just threw her over, taped her up ... I taped her wrists. I taped her legs ... [ajround the ankles, and then I taped her around the hair, and then I proceeded to fuck her in the ass.... [A]nd then I told her that if she was good after that; I told her if she was going to be cool, I’d let her up and I was going to let her go, and then when I let her up, she started just kicking and hitting, and kicking and hitting me, so I just put my hand over her and I grabbed some piece of material ... I pushed that over her face ... and then—uh—she stopped moving. Hernandez also admitted to “forcing] [Bristol] up against the hot engine cowling of the van in order to' burn her breasts” during the forcible sodomy. Hernandez, 47 Cal. 3d at 332, 253 Cal.Rptr. 199, 763 P.2d 1289. His motivation was clear by his own admission: he suffocated Bristol as punishment for not “being cool” after he violently raped and sodomized her. And the acts Hernandez took to render Bristol “totally defenseless”—attacking her in the back of the van, from which she could not escape, and taping her arms, legs, and mouth— also suggested premeditation and intent to kill. See Crittenden v. Ayers, 624 F.3d 943, 963 (9th Cir. 2010) (viewing petitioner’s gagging and tying of his victims as evidence of premeditation supporting a first degree murder conviction). In fact, Bristol’s wrists and ankles “had been bound so tightly that there were ligature marks on the skin and hemorrhage in the underlying tissues.” Hernandez, 47 Cal. 3d at 344-45, 253 Cal.Rptr. 199, 763 P.2d 1289. Hernandez’s confession contains even more compelling details of his intent to rape and murder Ryan. Ryan and Hernandez were friends, and spent time together in a group the evening of her death. The California Supreme Court described Hernandez’s actions that evening as follows: During the evening of playing pool and drinking beer, it was evident to several in the group that defendant was focusing considerable unwelcome attention on Ryan. He tried to put his arms around her, pinched her in the buttocks and put his hands on her hips, but she kept pushing him away.... Outside, defendant told Jackson he wanted to make a ‘sandwich’ out of Ryan; he wanted to ‘fuck her in the butt until she screams.’ He told Jackson he would ‘get some tonight or'tomorrow night.’ Hernandez, 47 Cal. 3d at 329-30, 253 Cal.Rptr. 199, 763 P.2d 1289.[2] Hernandez’s aggressive unwanted sexual touching of Ryan at'the bar, and his stated intent to later “make a ‘sandwich’ ” out of Ryan and “fuck her in the. butt until she screams” strongly suggest that he planned ahead of time to sexually assault and rape her. That same evening, Ryan ended up in his van, and although. Hernandez again tried to minimize his conduct by claiming that she “submitted freely,” the evidence suggests that she was forced. Before the group of friends dispersed from the bar, Ryan’s friend overheard Hernandez ask Ryan- to meet up with him after the gathering, and Ryan responding “no.” Hernandez admitted to the police that Ryan was “hesitant” about having sex with him but when he got “mad,” she finally “said oh, okay” because he had pushed her arms down and was about to force himself upon her. Despite Hernandez’s self-serving statements minimizing the amount of force used, his intent to rape Ryan is clear. Hernandez’s confession, coupled with the physical evidence, also .revealed his intent to murder Ryan. After she was raped and forcibly sodomized, Ryan, like Bristol, was screaming, kicking, and resisting. Hernandez .described his response as follows: I grabbed her, [held] onto her, and— uh—then she gargled—she like sputtered up—you know—I .guess I was choking her too hard, and then I let go, and then she was—I told her to mellow out and to start putting her clothes on, and I turned around to start doing it again, and then she' started screaming again and everything, and I just—I don’t know—I grabbed her, and I just— I tried to shut her up and ... [g]rabbed her around the throat ... [w]ith one of my hands, and put one of my hands over her mouth to keep her quiet. Hernandez strangled Ryan to death, and later admitted that he was thinking, in the same moment, of how he had killed Bristol in the same way just days before. His self-serving statement that he was “just ... try[ing] to shut her up” is undermined by the fact that Ryan had significant bruising around her neck—showing his intent to kill her, not simply quiet her screams. See People v. Frank, 38 Cal 3d. 711, 733, 214 Cal.Rptr. 801, 700 P.2d 415 (1985) (stating that “strangulation ... [as] a manner of killing shows at least deliberate intent to kill” and can “support an inference of premeditation and deliberation”). Significantly, not only was he fully aware of his actions, Hernandez also had the presence of mind to contemplate the consequences. After he killed Ryan, he cut her torso with a piece of glass in a deliberate, attempt to make her body look different than Bristol’s. Hernandez’s chilling insight into his own motivations gave the jury powerful, direct evidence of his willfulness, deliberation, and premeditation. Finally, the level of detail in Hernandez’s confession provided further compelling proof that he was aware, of and intended his actions. In a largely chronological fashion, Hernandez took the police through the events leading up to the rapes and murders, including very specific descriptions of his actions. Apart from detailing his thoughts and motivations, see supra, Hernandez admitted to mutilating both of his victims’ bodies post-mortem, and described the nature of the markings in -detail. Hernandez said that he burned Bristol’s pubic hair, explaining that he acted out of anger because Bristol had kicked him and damaged his van. He specifically remembered burning her left breast with a match, distinguishing that burn from the burns to her right breast caused by pushing her up against the. hot. car during forcible sodomy. He also described burning Ryan’s pubic hair with a lighter and putting out the flame with his hand, and cutting Ryan’s nipple with a piece of broken glass. Significantly, Hernandez admitted all of this to the police before. seeing any pictures of Bristol or Ryan’s bodies. His detailed recollection belies any suggestion that he was somehow in a dissociative state when he raped and killed Bristol and Ryan and deliberately mutilated their bodies. The majority dismisses the relevance of Hernandez’s confession because a single expert, Dr. Clausen, opined that Hernandez’s “ostensible recollection of details” was not inconsistent with a diminished capacity defense. Opinion at 856-57. Dr. Clausen based her rejection of Hernandez’s detailed recollection on the speculation, without any support in the record, that because Hernandez spent five hours with the police before the recording of his confession, they must have fed him details of the crime. But the district court found that Hernandez’s confession was voluntary, accurate, and reliable, and Hernandez does not challenge those findings here. Hernandez v. Martel, 824 F.Supp.2d 1025, 1155-59 (C.D. Cal. 2011). Moreover, Dr. Clausen’s explanation entirely fails to account for the many personal reflections that Hernandez freely shared about his feelings during the commission of the two crimes, -like how he “thought about” Bristol’s offer to “do anything” after he hit her. It is hard to imagine how a police officer could have fed Hernandez. such specific information about his motivations and the source of his anger, which Hernandez clearly articulated. In sum, the jury heard overwhelming evidence that Hernandez had the specific intent to rape both Bristol and Ryan, and that he murdered both women willfully, deliberately, and with premeditation. . B. The Relatively Weak Diminished Capacity Evidence Would Not Have Resulted in a Reasonable Probability of a Different Outcome The strength of the evidence of Hernandez’s intent, to rape and kill contrasts sharply with the relatively weak evidence “that might have been presented had, counsel acted differently”—specifically, evidence that his mental condition rendered him incapable of forming the requisite intent. See Clark, 769 F.3d at 728 (quoting Murtishaw, 255 F.3d, at 940). To reverse the murder convictions, the majority significantly overstates the habeas experts’ findings. At his post-conviction hearing, Hernandez presented testimony from five experts: psychologist June Madsen Clausen, psychiatrist Dorothy Otnow Lewis, criminologist Sheila Balkan, clinical psychologist Charles Sanislow, and neuropsychologist Ruben Gur. Hernandez, 824 F.Supp,2d at 1043. Drs. Sanislow and Gur were, used to rebut the findings of the state’s expert, clinical psychologist Daniel Martell.[3] Id. at 1062. Dr. Sanislow merely reviewed and commented on Martell’s discredited evaluation of Hernandez. He found that the absence of bipolar indications in Martell’s then-recent testing of Hernandez “[was] not a sufficient basis on which to conclude that Mr. Hernandez is not bipolar,” and that a negative finding on the administered psychometric test “does not rule out the presence or past presence of psychopathology (e.g., dissociative disorders, bipolar or other affective disorders).” (Emphases added.) While his conclusions were sufficient, among other reasons, to lead the district court to discount Martell’s evaluation, they are certainly not a conclusive diagnosis of bipolar disorder. Dr. Gur, the second rebuttal expert, believed Hernandez suffers from brain dysfunction. He found “clear indications] that [ ] Hernandez has deficits in understanding and interpreting facial expressions of affect, which would provide” the basis “for such confusion and misperceptions to have occurred during the commission of the crimes ... interfering] with his ability to comprehend and formulate an appropriate response to the victims’ expressions of resistance and fear,” and “significantly interfering] with his ability to make the right' judgment.” But a lack of good judgment is not equivalent to the inability to form specific intent. Moreover, Hernandez’s own statements—even made to Dr. Gur himself during their evaluation[4]—belie the notion that Hernandez could not perceive the emotions of his victims. On the contrary, Hernandez was able to articulate that his victims were afraid, did not consent to sexual activity, and resisted him. And while, in deposition, Dr. Gur concluded that “either schizophrenia or bipolar illness is probably applicable in his case,” he also admitted that Hernandez could suffer from something else entirely, “such as attention deficit, hyperactivity disorder, impulse controls.” Hernandez, 824 F.Supp.2d at 1063 (emphasis added) (quoting Dr. Gut’s deposition). Dr. Lewis diagnosed Hernandez with psychosis and bipolar disorder, found that he had “compromised mental functioning,” and concluded that his “capacity to form the specific intent to rape and kill[] was substantially impaired” at the time he committed the crimes. Dr. Balkan, a criminologist, provided a social history of Hernandez’s life and otherwise largely quoted Dr. Lewis’s conclusions. While these evaluations raise concerns about Hernandez’s mental stability, they do not show that Hernandez lacked the ability to form the necessary specific intent for these crimes. Dr. Lewis found Hernandez’s mental state to be “compromised” and “substantially impaired,” but not necessarily inconsistent with specific intent to murder and rape. And, as she acknowledged, no single factor in Hernandez’s difficult life accounts for his violent crimes. The final habeas expert was Dr. Clau-sen, whose opinion comes closest to stating definitively that Hernandez could not have had the necessary specific intent. Dr. Clau-sen opined that Hernandez “was in a trauma-induced dissociative state” at the time of his crimes, “and as a result, has no subsequent actual recollection of the events that transpired.” But the suggestion by Dr. Clausen that Hernandez was in a dissociative state and “had no subsequent actual recollection” of his crimes is totally contradicted by his detailed confession, the voluntariness and reliability of which Hernandez does not dispute. Even generously construed, these opinions are grossly inadequate to undermine the evidence that Hernandez was capable of forming, and in fact formed, the intent to rape and kill Bristol and Ryan. First, the experts fail to account for the striking similarities between the two crimes. Dr. Gur theorized that mental impairments like Hernandez’s could cause someone to “engage in a complex set of behaviors without intent or premeditation,” leading to “highly organized if somewhat ritualistic behavior.” Opinion at 857. The majority relies on this to argue that the “sheer bizarreness of the nearly identical crimes” would have “supported, rather than undermined” a mental illness diminished capacity defense, Opinion at 857, but that inference is implausible. Hernandez’s behavior does not suggest ritual so much as it expresses an intent to murder Bristol and Ryan because, as Hernandez himself explained, he was angry at their resistance.[5] And none of the other experts even attempted to explain how Hernandez could have committed two such similar crimes within a five-day period without intending to do so. Second, the experts’ reports also fail to counter the overwhelming evidence that Hernandez intended to rape Bristol and Ryan. The habeas experts uncovered no evidence to suggest Hernandez was in a dissociative state when he “thought about” Bristol’s offer to “do anything” to save herself from his violence; when, earlier in the evening, he sexually harassed' Ryan and bragged of plans to “get some” later; or when he pushed Ryan’s arms down and raped her after she said no to sexual intercourse. In fact, even Dr. Clausen, who speculated that the police fed Hernandez the details of his confession and that Hernandez in fact did not remember much of the crimes due to dissociation, stated that Hernandez had “personal memory up to and including having sex with Edna Bristol in the back of his van.” Dr. Gur’s dissociation theory was similarly temporally limited, noting that Hernandez’s “clinical profile is further indication that he was in a dissociative state during his commission of the crimes, or at least during some portion of that epoch, e.g:, when he killed or inflicted post-mortem injuries.” (Emphasis added.) Thus, even assuming Hernandez dissociated during the murders, the experts’ conclusions actually support the inference that Hernandez was at least aware of, and intended, his actions during the rapes. The intent to rape alone is enough to support the murder convictions. Finally, the experts’ dissociation theory fails to account for Hernandez’s detailed explanation of his actions, thoughts, and motivations during the crimes. Drs. Gur and Lewis surmised that Hernandez’s confession suggested that he was in “an altered mental state” on the nights of the crimes based on his statement that he “wasn’t even feeling that [he] did it,” and his request for psychiatric help because he “[didn’t] know what would make [him] do this.” The majority finds this “evidence of psychosis” would have been a convincing counterweight to his detailed confession. Opinion at 856-57. But “a reasonable jury could have easily chosen to disbelieve [these] self-serving” statements in light of Hernandez’s extensive account of his innermost thoughts and motivations on the nights of the crimes. See United States v. Nicholson, 677 F.2d 706, 709 (9th Cir. 1982)..Moreover, while Drs. Gur and Lewis make much of the fact that Hernandez is persistently “unable” to explain why he. committed the brutal murders, this assertion is squarely contradicted by the record. Hernandez provided a plausible, albeit deeply disturbing explanation of his motives—he was angry at Bristol for talking too much, kicking him, and kicking a hole in his van, and he was angry at Ryan for screaming and trying to escape. His explanation of how he expressed that anger (rape, forced sodomy, and strangulation) suggests intentional, premeditated actions and not dissociation or a lack of control that would negate the mens rea required for a first degree murder conviction. As the California Supreme Court correctly explained, “clearly the killings occurred when the victims screamed and struggled to get away. They occurred as a direct product of the sexual assaults and to silence the victims.” Hernandez, 47 Cal. 3d at 348, 253 Cal.Rptr. 199, 763 P.2d 1289. Given the weakness of the omitted experts’ evaluations when compared to the overwhelming evidence actually presented to the jury, there is no reasonable possibility of a different outcome in. this case. See Strickland, 466 U.S. at 694,104 S.Ct. 2052. C. The Majority’s Remaining Arguments Are Unconvincing The majority notes that we have “repeatedly” found prejudice where “there was some evidence of the defendant’s mental impairments in the record” that counsel failed to investigate, Opinion at 855-56, but every cited case contains, far more compelling evidence of prejudice than we have here. All the cases relied on by the majority involve defendants with conclusive diag-nosés of significant psychosis and mental health problems. In Daniels v. Woodford, the petitioner had been diagnosed with schizophrenia and a paranoid disorder that he experienced “at significant times prior to the shootings as well as during the shooting” of which he was convicted. 428 F.3d 1181, 1204 (9th Cir. 2005). In Jennings v. Woodford, the petitioner was a diagnosed schizophrenic and “a long-term methamphetamine addict who had used the drug on the night” of his crime; had a history of suicide attempts; repeatedly “injured] himself intentionally and pour[ed] liquids in the resulting wounds,” and had been involuntarily committed for psychiatric reasons. 290 F.3d 1006, 1015 (9th Cir. 2002). In Bloom v. Calderon, the petitioner had previously been referred for psychiatric treatment, had experienced auditory and visual hallucinations, and post-conviction' experts found “striking, consistent and clear evidence of cognitive sensori-motor [sic] deficits, brain dysfunction and brain damage;” 132 F.3d 1267, 1274, 1276 (9th Cir. 1997). In comparison, Hernandez’s experts reached far less definitive conclusions regarding the extent of Hernandez’s neurological damage and mental illness and how his conditions might have affected his ability to form the requisite intent. Moreover, in Daniels, our prejudice finding was driven by the relevance of fully-developed diminished capacity evidence to possible imperfect self-defense. We noted that the petitioner’s paranoia and schizophrenia could have led him to believe the police officers he shot “were coming to kill or seriously harm him.” 428 F.3d at 1208. Indeed, they had actually done so before. Id, at 1209 (noting “that Daniels had previously been shot by the police nine times”). See also Seidel v. Merkle, 146 F.3d 760, 756-57 (9th Clr. 1998) (finding prejudice where counsel failed to investigate his client’s mental health for a possible imperfect -self-defense theory where petitioner had been convicted of knifing someone during a struggle). That context is entirely absent here. Finally, while diminished capacity, when available, could serve as a defense even to crimes that involved significant premeditation, see Daniels, 428 F.3d at 1207-08, no reasonable juror would have discounted Hernandez’s disturbing but plausible explanation of his'state of mind as he raped and murdered Bristol and Ryan. The mental health and neurological evidence presented on collateral review cannot explain away this awareness such that a rational juror would have found Hernandez to lack the required specific intent to rape and kill Bristol and Ryan. ¾* ⅜ ⅜ I respectfully dissent from Part II of the majority opinion and would deny the habe-as petition. . The majority summarizes this portion of Hernandez’s confession as follows: “He picked up Bristol hitchhiking but when he got lost, he got mad and stopped the van.” Opinion at 847. This is a mischaracterization of Hernandez’s statement. While he mentions getting lost, Hernandez clearly connects his anger to Bristol's continued discussion of her problems. . Ryan's stepmother also testified to suspicious circumstances surrounding her daughter’s roofn. The morning after Ryan's death, her stepmother found "the lights still on and the drapes , and the sliding glass door open. ... [H]er bedroom window was open and missing in its screen.” Hernandez, 47 Cal. 3d at 328-29, 253 Cal.Rptr. 199, 763 P.2d 1289. Ryan had told her stepmother she was going out to play pool, but her pool cue and jacket were on the living room floor. Id. at 329, 253 Cal.Rptr. 199, 763 P.2d 1289. "[Her] purse, was outside on the ground and items from the purse were spilled out.” Id. The jury could have believed that Hernandez kidnapped Ryan, which would support a finding of specific intent to rápe. . Hernandez told Dr. Gur that Bristol "did not consent to anal intercourse.” Dr. Gur does not explain how he concludes that Hernandez could have thé mental capacity to commit forcible sodomy in that instant, but lack the capacity to form specific intent immediately before (while raping) or after (while strangling). . The majority also points to the similarities between the child abuse suffered by Hernandez and the way he harmed his victims. Opinion at 854-55, 857-58. As Dr. Lewis noted, “[c]hildren who have had objects shoved into their rectums repeatedly against their will are at a high risk of perpetrating similar acts on others.” But Dr. Lewis does not claim this heightened risk might create a lack of capacity to form specific intent or that the abuse victim would only inflict similar violence while in a dissociative state. . Like the majority, I give no independent consideration to Martell's findings because the district court found significant problems with his methodology and credibility. See Hernandez, 824 F.Supp.2d at 1056.