# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 47179

| | | |
|---|---|---|
| **TIMOTHY ALAN DUNLAP,** | ) | **Boise, September 2021 Term** |
| | ) | |
| **Petitioner-Appellant,** | ) | **Opinion Filed: August 30, 2022** |
| | ) | |
| **v.** | ) | **Melanie Gagnepain, Clerk** |
| | ) | |
| **STATE OF IDAHO,** | ) | **SUBSTITUTE OPINION. THE** |
| | ) | **COURT'S PRIOR OPINION** |
| **Respondent.** | ) | **DATED JANUARY 5, 2022 IS** |
| | ) | **HEREBY WITHDRAWN.** |

Appeal from the District Court of the Sixth Judicial District, State of Idaho, Caribou County. Mitchell W. Brown, District Judge.

The judgment of the district court is <u>affirmed</u>.

Eric D. Fredericksen, State Appellate Public Defender, Boise, for appellant Timothy Alan Dunlap. Shannon N. Romero argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent State of Idaho. L. LaMont Anderson argued.

———————————————

STEGNER, Justice.

This is an appeal from an order dismissing a petition for post-conviction relief. Timothy Dunlap was sentenced to death by a Caribou County jury in 2006. In 2008, Dunlap filed a petition for post-conviction relief, alleging that numerous errors had occurred at his 2006 sentencing hearing. The district court dismissed the petition in its entirety. Dunlap appealed to this Court. In *State v. Dunlap*, 155 Idaho 345, 313 P.3d 1 (2013) ("*Dunlap V*"), this Court affirmed the dismissal of all but two of Dunlap's claims. These were: (1) multiple claims of prosecutorial misconduct under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959); and (2) ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).

Upon remand, the district court held two evidentiary hearings, one involving each of Dunlap's remaining claims. The district court found that Dunlap had failed to establish either claim and denied Dunlap's request for post-conviction relief. Dunlap timely appealed. For the reasons discussed below, we affirm the decisions of the district court.

1

# I.    FACTUAL AND PROCEDURAL BACKGROUND

In 1991, Dunlap pleaded guilty to the first-degree murder of Tonya Crane, a bank teller in Soda Springs. The plea agreement allowed the State to seek the death penalty, which it did. Dunlap was sentenced to death by the district court in 1992.

After this Court affirmed Dunlap's conviction and sentence on direct appeal, *State v. Dunlap*, 125 Idaho 530, 873 P.2d 784 (1993) ("*Dunlap I*"), Dunlap filed a petition for post-conviction relief, challenging both his conviction and sentence. This Court once more affirmed his conviction. *Dunlap v. State*, 141 Idaho 50, 106 P.3d 376 (2004) ("*Dunlap II*"). The State, however, conceded that an error had occurred in the original sentencing hearing and agreed that Dunlap should be resentenced. Because the United States Supreme Court had decided *Ring v. Arizona*, 536 U.S. 584 (2002), in the interim, which held that the Sixth Amendment right to a jury trial extended to imposition of the death penalty, this Court remanded the case for resentencing by a jury instead of a judge. *Id.*

The State again sought the death penalty. This time, the Idaho Attorney General's office was appointed as a special prosecutor. Three Deputy Attorneys General ("DAGs") in the Prosecutorial Assistance Unit of the Attorney General's office were assigned to prosecute Dunlap at his resentencing hearing: Kenneth Robins (lead counsel), Justin Whatcott, and Scott Smith.

Dunlap was represented by two attorneys at the resentencing hearing: David Parmenter and James Archibald. Parmenter was lead counsel and Archibald was co-counsel. The defense team also retained an investigator, Roseanne Dapsauski, as a mitigation specialist.

District Judge Don Harding presided over the resentencing hearing, which took place on seven separate days in February 2006. The State presented testimony from fourteen witnesses: Mary Goodenough, a bank teller who was working the day Tonya Crane was shot; Margo May, a bank employee who was also working the day Tonya Crane was shot; Claude Mendenhall, a bank patron who was present outside the bank the day Tonya Crane was shot; Steve Somsen, a deputy sheriff with the Caribou County Sheriff's Department; William Long, an FBI agent; Sheriff Ray Van Vleet, the Caribou County Sheriff; Dr. John Obray, a surgeon who had attempted to treat Tonya Crane after she was shot (Obray's deposition was read to jury as he did not testify live); Jerry Bavaro, a Soda Springs police officer; Dorothy Schugt, the owner of the motel where Dunlap stayed while in Soda Springs; Blynn Wilcox, the Soda Springs Chief of Police; Dr. Kerry Patterson, the pathologist who performed the autopsy of Tonya Crane; Don Wyckoff, the lab

manager for the State Crime Lab; Dwight Van Horn, an Idaho State Police firearms inspector; and Marilyn Young, an Indiana newspaper reporter Dunlap had contacted to discuss his prior crime in Indiana as well as Tonya Crane's murder.

Dunlap then presented testimony from seven witnesses: Terry Clem, Dunlap's first-grade teacher; Dr. Mark Cunningham, an expert clinical and forensic psychologist; Judge Richard Striegel, a judge in Indiana who had prior dealings with Dunlap; Mark Dunlap, Dunlap's younger brother; Suzanne Nelson, Dunlap's younger sister; Patricia Henderson, Dunlap's mother; and Dr. Craig Beaver, an expert neuropsychologist. Video depositions of Clem and Striegel were played for the jury, and Cunningham's testimony from a prior post-conviction proceeding was read to the jury; only Dunlap's family members and Beaver testified live.

In rebuttal, the State presented testimony from Daryl Matthews, M.D., a forensic psychiatrist. Dunlap presented no other witnesses in response to Matthews' testimony. The State then read several victim impact statements to the jury and Dunlap made a statement in allocution. Both the State and Dunlap presented closing arguments.

> After the close of evidence,
>
> [t]he jury found that the State proved three statutory aggravating factors beyond a reasonable doubt, specifically: (1) by the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life (I.C. § 19–2515(9)(f)) (the utter disregard aggravator); (2) the murder was committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, kidnapping or mayhem and the defendant had the specific intent to cause the death of a human being (I.C. § 19–2515(9)(g)) (the specific intent aggravator); and (3) the defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society (I.C. § 19–2515(9)(h))1 (the propensity aggravator). The jury further found that all the mitigating evidence, weighed against each aggravator, was not sufficiently compelling to make imposition of the death penalty unjust.

*Dunlap V*, 155 Idaho at 358, 313 P.3d at 15 (footnotes omitted). Then, "[i]n accordance with the verdict, the district court entered a judgment sentencing Dunlap to death." *Id.*

Dunlap filed a petition for post-conviction relief with the district court on May 27, 2008, alleging that numerous reversible errors had occurred at his 2006 resentencing hearing which entitled him to a new sentencing hearing. On November 24, 2009, the district court granted the State's motion for summary dismissal of the petition. Dunlap appealed to this Court, which affirmed the district court's dismissal of all but two of Dunlap's claims: (1) prosecutorial

3

misconduct under *Brady* and *Napue*; and (2) ineffective assistance of counsel under *Strickland*. We remanded the case, instructing the district court to hold an evidentiary hearing on those issues.

Upon remand, and at the request of the parties, the district court bifurcated the two claims, holding a separate evidentiary hearing for each. At the first evidentiary hearing, held August 26, 27, and 28, 2014, the parties presented evidence on the prosecutorial misconduct claim. On July 29, 2015, the district court denied Dunlap relief under both *Brady* and *Napue* and entered a partial judgment of dismissal as to Dunlap's prosecutorial misconduct claim. Dunlap petitioned this Court for permission to appeal this initial determination, which this Court denied on September 21, 2015. Dunlap also moved the district court for reconsideration of the dismissal, which the district court denied on September 30, 2015.

The second evidentiary hearing was held in April 2016, and consisted of ten days of testimony. The parties presented evidence regarding Dunlap's ineffective assistance of counsel claims. After granting multiple extensions of time for both parties, the district court denied relief and entered a final judgment dismissing Dunlap's petition for post-conviction relief in its entirety on May 28, 2019. Dunlap moved for reconsideration of the district court's dismissal of his post-conviction relief claims, which the district court denied on December 3, 2019.

Dunlap timely appealed.

## II.    STANDARD OF REVIEW

"Post-conviction proceedings are civil in nature and therefore the applicant must prove the allegations by a preponderance of the evidence." *Dunlap II*, 141 Idaho at 56, 106 P.3d at 382. "Upon review of a district court's denial of a petition for post-conviction relief when an evidentiary hearing has occurred, this Court will not disturb the district court's factual findings unless they are clearly erroneous." *McKinney v. State*, 133 Idaho 695, 700, 992 P.2d 144, 149 (1999). "A factual finding is clearly erroneous only if it is not supported by 'substantial and competent evidence in the record.'" *Stuart v. State*, 127 Idaho 806, 813, 907 P.2d 783, 790 (1995) (quoting *Pace v. Hymas*, 111 Idaho 581, 589, 726 P.2d 693, 701 (1986)).

"This Court exercises free review of the district court's application of the relevant law to the facts." *Dunlap II*, 141 Idaho at 56, 106 P.3d at 382. However, the "'duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987)). This is because

4

the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion).

### III.  ANALYSIS

Dunlap makes two prosecutorial misconduct claims on appeal: first, that the prosecution suppressed favorable and material evidence regarding Dunlap's mental health in contravention of *Brady*; and second, that the prosecution either elicited or failed to correct false testimony in contravention of *Napue*. Dunlap also asserts several ineffective assistance of counsel claims pursuant to *Strickland*. Each will be discussed in turn.

**A.  The district court did not err in denying relief on Dunlap's prosecutorial misconduct claims.**

   1.  The district court did not err in denying Dunlap relief under *Brady*.

Around the same time as his 2006 resentencing hearing, Dunlap and the Attorney General's office were engaged in a separate lawsuit. On May 7, 2004, Dunlap filed a *pro se* complaint in the U.S. District Court for the District of Idaho, alleging he was being housed inappropriately at the Idaho Maximum Security Institution (IMSI) in violation of his civil rights because he was housed in Tier 2 of "C-block" rather than in the general population (the "federal housing case"). Dunlap named Warden Greg Fisher as a defendant.

William Loomis, a DAG with the Idaho Department of Correction (IDOC) Unit of the Attorney General's office, was assigned to represent Fisher in Dunlap's federal housing case. On January 31, 2005, Loomis emailed both the Chief Psychologist at IDOC, Dr. Chad Sombke, and Fisher, asking Sombke to provide a "brief explanation of why Dunlap is in [T]ier 2 and why he cannot be moved into the general population." Sombke responded that "C-block Tier 2 is for the stable *mentally ill* and Mr. Dunlap would fit that category." (Italics added.) Sombke noted that, in his opinion, Dunlap would be "cleared psychologically to be moved to [the] general population." Sombke also told Loomis that, while Dunlap "is functional enough to be" in the general population, it was Sombke's opinion that Dunlap would not do well there.[1] Fisher also responded to Loomis' email, stating that he "always defer[red] to the decision of Dr. Sombke as to whether or not

---

[1] Sombke apparently feared for Dunlap's safety if he were to be housed in the general population. Dunlap is of slight stature, which could put him at risk of predation by other inmates.

5

[inmates with mental health issues] should be considered for other housing, be it restrictive or general population."

On January 9, 2006, about a month before the resentencing hearing, Loomis called Robins. Loomis planned to seek a stay in Dunlap's federal housing case pending the results of the resentencing hearing, and he asked Robins to provide an affidavit. Robins agreed to do so, and Loomis filed Robins' affidavit with the federal district court. The subject of Dunlap's mental health was apparently never broached at any point during the telephone conversation between Robins and Loomis.

In this appeal, Dunlap argues that, in violation of *Brady*, the State suppressed the 2005 opinions of Sombke and Fisher that Dunlap was mentally ill and housed accordingly. "'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *State v. Hall*, 163 Idaho 744, 830, 419 P.3d 1042, 1129 (2018) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). The district court found that the prosecution had not suppressed any alleged *Brady* evidence, the second prong of the test, and denied relief. Because the district court concluded Dunlap had failed to establish that the State suppressed any potential *Brady* evidence, it did not consider whether the evidence was favorable to Dunlap or resulted in prejudice.

To support his contention that the 2005 opinions of Fisher and Sombke were suppressed by the State, Dunlap presents two main arguments: first, "the district court erroneously concluded knowledge of [Dunlap]'s mental health was not imputed from [D]AGs and state agents who assisted the State in defending against [Dunlap]'s federal lawsuit[] to [D]AGs prosecuting [Dunlap]'s capital sentencing." The crux of Dunlap's first argument is that Robins, who was employed in the Prosecutorial Assistance Unit of the Attorney General's office, and Loomis, who worked for the IDOC Unit of the Attorney General's office, are within the same "prosecutor's office" for purposes of *Brady*. Dunlap argues that, given Robins' assistance to Loomis in Dunlap's federal housing case, Robins had a duty to inquire of Loomis regarding any potential *Brady* material. Dunlap urges Loomis' knowledge of Sombke's and Fisher's 2005 opinions should be imputed to Robins.

Second, Dunlap argues the district court improperly shifted the burden to defense counsel to uncover exculpatory evidence known by the State. Dunlap argues that the district court

erroneously adopted the "diligent defender" standard set forth in *United States v. Hicks*, 848 F.2d 1 (1st Cir. 1988), and impermissibly shifted the burden the State owed Dunlap under *Brady*. Dunlap further contends this Court rejected the "diligent defender" standard when it decided *Grube v. State*, 134 Idaho 24, 995 P.2d 794 (2000).

We conclude there was no suppression by the State because Dunlap's defense team was apprised of the purportedly suppressed evidence. At the second evidentiary hearing, the district court admitted Parmenter's notes regarding a meeting he had with Dunlap on August 24, 2005. Next to Sombke's name, Parmenter had written "also thinks Tim's crazy."[2] In the note, "crazy" is underlined. Also admitted were notes written by Dapsauski regarding a meeting she had with Dunlap approximately two months later, on October 21, 2005, which state that Dunlap "got off [death] row in 2002 and then he was sent to C Block, Tier II because that is where Sombke said he should be housed." Dapsauski further noted that Sombke "thinks Tim is crazy and should be on Tier [2] the rest of his life." Dapsauski testified at the second evidentiary hearing that this note was "provided to counsel."

It is clear from the record that not only was Dunlap's defense team aware that Sombke believed Dunlap was mentally ill, but the defense team was also aware that Sombke believed Dunlap was appropriately housed due to his mental health issues. "[W]hen a defendant possesses 'the salient facts regarding the existence of the [evidence] that he claims [was] withheld,'" there is no *Brady* violation. *Hall*, 163 Idaho at 831, 419 P.3d at 1129 (quoting *Raley v. Ylst*, 444 F.3d 1085, 1095 (9th Cir. 2006)). If "a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government." *Id.* at 831–32, 419 P.3d at 1129–30 (quoting *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991)). Because Dunlap's counsel were aware of the "salient facts," we conclude that there was no suppression by the State. This defeats Dunlap's *Brady* claim, and we need not address the other two prongs of the *Brady* analysis.

Therefore, we hold the district court did not err when it denied Dunlap relief under *Brady*.

2. The district court did not err in denying Dunlap relief under *Napue*.

At the resentencing hearing, the State attempted to portray Dunlap as mentally competent and as a malinger seeking to avoid execution. To support these theories, the State relied on

---

[2] We recognize that use of the word "crazy" to describe someone with a mental illness is both archaic and offensive. However, because Dunlap's mental illness is the subject of the dispute here, we find it necessary to quote certain witnesses and evidence verbatim for the sake of clarity and accuracy.

7

Exhibit 39, a small excerpt of Dunlap's mental health records comprising four pages of medical chart notes from 2002. The notes discussed instances in which Dunlap had admitted to IMSI mental health professionals that he had concocted stories of delusions, which supported the State's malingering theory. For example, one note, written by Sombke, stated that Dunlap "continued to say that his past behavior was all purposeful and due to him being on death row" and quoted Dunlap as saying "'I've always said this was all due to my sentence and once I got off, I'd change.'" Another note, written by IMSI clinician Royce Creswell, stated Dunlap, "by his own admission, was faking mental illness and was [] adept at the scam." Creswell's note continued: "Wow – This man had me fooled!! He is on no meds of any kind and he is completely clear." It is undisputed that Exhibit 39 did not contain the bulk of Dunlap's chart notes or consist of anything more than a small snippet of Dunlap's records.

Robins used Exhibit 39 to question both Beaver and Matthews about Dunlap's mental health. Robins asked Beaver whether Exhibit 39 was "part of the records that [he] had evaluated" and elicited testimony from Beaver regarding what was contained in those notes. Robins also elicited testimony from Matthews that the notes within Exhibit 39 were "some of the most important documents in the record" and that "[t]he jury should give them powerful weight [because] what you have got here, basically, are a bunch of seasoned mental health professionals who admit that [] Dunlap pulled the wool over their eyes."[3]

Robins also questioned Matthews about the medical notes of Dr. Kenneth Khatain, a mental health professional who treated Dunlap at IMSI and concluded Dunlap was mentally ill. Matthews testified that "[o]ne of the remarkable things about those notes is that it looked like that doctor didn't even think about the possibility of malingering. . . . I couldn't even find the record where there was a complete evaluation done by this doctor." When asked on cross-examination by Archibald whether Khatain had met with Dunlap on a monthly basis, Matthews responded that Khatain

> may [have]. I didn't see a month-by-month record from this doctor. I saw about five notes over the course of about five years. So how often he actually met with him and what the frequency of his meetings were, I don't actually know. I do know there were times that he would not meet with them because Mr. Dunlap didn't want [t]o meet with them. So I just don't know the answer to that.

---

[3] In *Dunlap V*, this Court found this exchange regarding the weight the jury should give a particular piece of evidence to be harmless error. 155 Idaho at 370–71, 313 P.3d 26–27.

On appeal, Dunlap argues that Exhibit 39 is false because of its "gross omissions," rendering any testimony regarding Exhibit 39 from Beaver and Matthews "false testimony" within the meaning of *Napue*. Additionally, Dunlap contends Matthews falsely testified about Khatain's treatment of Dunlap.

"[T]o establish a *Napue* violation[,] a defendant must show '(1) the testimony was false; (2) the prosecutor should have known it was false; and (3) the testimony was material.'" *State v. Lankford*, 162 Idaho 477, 503, 399 P.3d 804, 830 (2017) (quoting *State v. Wheeler*, 149 Idaho 364, 368, 233 P.3d 1286, 1290 (Ct. App. 2010)). The district court found that the prosecution did not knowingly present false testimony or allow unsolicited false testimony to go uncorrected and denied Dunlap relief on his *Napue* claim. Because the district court concluded Dunlap had failed to establish that the State presented *Napue* evidence, it did not consider whether the presentation of allegedly false evidence was material.

To support his claim that the State knowingly elicited or failed to correct false testimony, Dunlap points to what Exhibit 39 did not contain: Sombke's 2005 opinion that Dunlap was mentally ill and housed correctly and Creswell's 2003 opinion that Dunlap was mentally ill and needed antipsychotic medication. Dunlap contends that "[t]his testimony and evidence left the impression that [Dunlap] was faking it and everyone at IMSI agreed" even though "Robins knew Exhibit 39 falsely represented Sombke's and Creswell's opinions regarding [Dunlap]'s mental illness." Dunlap additionally contends that Matthews' testimony about only seeing five notes "intentionally impl[ied] Khatain saw [Dunlap] only five times in five years," which was demonstrably false.

During the cross-examination of Beaver, Robins asked if the mental health records contained in Exhibit 39 were "*part of* the records that [Beaver] evaluated." (Italics added.) Beaver answered affirmatively. Additionally, during the direct examination of Matthews, Robins refers to Exhibit 39 as "a series of records dealing with situations where it was asserted that [] Dunlap admitted that he actually – that it was all an act or that he made up or malingered mental illness." Robins then asked Matthews, "[i]n *these particular situations*, how should that affect the diagnosis of Mr. Dunlap? What weight should the jury give it?" (Italics added.) Neither Robins, Beaver, nor Matthews ever characterized the opinions in Exhibit 39 as being the only mental health opinions in the record.

As to the testimony regarding Khatain, when asked on cross-examination by Archibald whether Khatain met with Dunlap on a monthly basis, Matthews responded that Khatain "may have" but that he had not seen a "month-by-month record." Dunlap contends that "[h]ow many notes Matthews 'saw' is irrelevant," but it appears that Matthews was simply testifying to his own recollection as to what he reviewed in the IDOC records. Additionally, as pointed out by the State, Matthews' testimony was "couched in uncertainty": Matthews explicitly stated that he "just [didn't] know the answer" and that Khatain "may have" met with Dunlap on a monthly basis.

Because Dunlap has failed to show the existence of false testimony, we hold the district court did not err when it denied Dunlap relief under *Napue*. As such, we need not address the other two prongs of the *Napue* analysis.

**B. The district court did not err in denying relief on Dunlap's ineffective assistance of counsel claims.**

Dunlap makes three primary ineffective assistance of counsel claims on appeal: first, that the district court applied an improper, heightened standard to the ineffective assistance of counsel claims; second, that Dunlap's defense team was ineffective in failing to investigate and present certain mitigating evidence; and third, that the district court improperly considered the alleged instances of ineffectiveness in isolation, rather than collectively, when determining their prejudicial effect.

In determining whether a defendant received effective assistance from his counsel, this Court looks to the United States Supreme Court's two prong test set forth in *Strickland*:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

To establish deficient performance, this Court requires a defendant to show that "counsel's representation fell below an objective standard of reasonableness." *State v. Abdullah*, 158 Idaho 386, 417, 348 P.3d 1, 32 (2015) (quoting *Strickland*, 466 U.S. at 687). As this Court set forth in *Dunlap V*:

Trial counsel has a duty to conduct a thorough investigation in preparation for the penalty phase of a capital case. *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 38–41 (2009). Presentation of some mitigating evidence, even if strong, is insufficient if other mitigating evidence is available upon reasonable investigation. *Rompilla v. Beard*, 545 U.S. 374, 387–93 (2005). However, no relief is mandated where counsel's investigation is not as thorough as it could have been because the courts "address not what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 794 (1987). This Court held, in *State v. Row*, that counsel is not required to investigate a defendant's "entire life in order to objectively present . . . mitigation evidence" and that decisions regarding mental health and allocution statements are "strictly strategic and shall not be second-guessed by this Court." 131 Idaho 303, 313, 955 P.2d 1082, 1092 (1998).

155 Idaho at 388, 313 P.3d at 44. "While there is no duty to sort through the defendant's 'entire life,' easily available mitigation evidence cannot be ignored." *Id.*

There is a "strong presumption" that defense counsel "made all significant decisions in the exercise of reasonable professional judgment." *Abdullah*, 158 Idaho at 418, 348 P.3d at 33 (citing *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011)).

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana*, [350 U.S. 91, 101 (1955)]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689. "Tactical decisions made by counsel will not be second-guessed on post-conviction relief, unless made upon the basis of inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation." *Abdullah*, 158 Idaho at 505, 348 P.3d at 120.

To establish prejudice, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 418, 348 P.3d at 33 (quoting *Strickland*, 466 U.S. at 698). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome," creating a substantial likelihood that the outcome would have been different, as opposed to a conceivable likelihood. *Id.* (citing *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).

1. The district court applied the correct legal standard when analyzing Dunlap's ineffective assistance claim.

Dunlap contends that, rather than applying the correct two-prong analysis under *Strickland*, the district court erroneously applied a "doubly deferential standard" as set out in *Harrington v. Richter*, 562 U.S. 86 (2005). Dunlap argues that the *Harrington* standard only applies to federal habeas proceedings in which federal courts are reviewing state habeas proceedings, not to the state habeas proceedings themselves, and that both this Court and the United States Supreme Court have misread *Strickland*:

> Though even this Court has cited this incorrect standard with attribution to *Harrington v. Richter*, *Strickland* makes clear that "[t]he result of the proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors cannot be shown by a preponderance of the evidence to have determined the outcome." In fact, *Harrington* cites *Strickland* for the principle that "[t]he likelihood of a different result must be substantial, not just conceivable," even though this principle is nowhere to be found in *Strickland*.

*Harrington* involved a federal habeas petition that was subject to the requirements of the Antiterrorism and Effective Death Penalty Act (AEDPA). 562 U.S. at 91. In *Harrington,* the defendant first filed a petition for a writ of habeas corpus in state court, alleging ineffective assistance of counsel under *Strickland. Id.* at 96. The California Supreme Court denied relief, prompting the defendant to file a subsequent habeas petition in federal court alleging the same claim. *Id.* at 97. The federal district court denied relief, as did a three-judge panel of the Ninth Circuit. *Id.* However, an *en banc* panel of the Ninth Circuit reversed the three-judge panel's decision, determining that the California Supreme Court's denial of relief on the defendant's ineffective assistance of counsel claim was "unreasonable." *Id.*

The Supreme Court then reversed the *en banc* panel of the Ninth Circuit. *Id.* at 91. When evaluating ineffective assistance of counsel claims that are subject to AEDPA, a federal court may only grant habeas relief in three limited situations: first, if "it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of [the Supreme] Court"; second, if "it 'involved an unreasonable application of' such law"; or third, if "it 'was based on an unreasonable determination of the facts' in light of the record before the state court." *Id.* at 100 (quoting 28 U.S.C. § 2254(d)). Because the Ninth Circuit relied on the second of these scenarios to grant habeas relief, the Supreme Court explained that "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id.* at 101.

This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different.

*Id.* The *Harrington* Court further stated that "[e]stablishing that a state court's application of *Strickland* was unreasonable under [AEDPA] is all the more difficult. The standards created by *Strickland* and [AEDPA] are both highly deferential, and when the two apply in tandem, review is doubly so." *Id.* at 106 (internal quotations and citations omitted).

Before answering "[t]he pivotal question" of "whether the state court's application of the *Strickland* standard was unreasonable," the Court laid out the standard for *Strickland's* second prong:

In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The likelihood of a different result must be substantial, not just conceivable.

*Id.* at 111–12 (quoting *Strickland*, 466 U.S. at 696, 693, 697). The Court found that "[i]t would not have been unreasonable for the California Supreme Court to conclude [the defendant's] evidence of prejudice fell short of *this standard*." *Id.* at 112 (italics added).

Contrary to Dunlap's argument, when the Supreme Court stated "[t]he likelihood of a different result must be substantial, not just conceivable," it was not setting out a "doubly deferential" test under both *Strickland* and AEDPA. Instead, the Supreme Court was simply explaining the second prong of the *Strickland* analysis. The "doubly deferential" standard comes into play only when a federal court is tasked with determining whether a state court applied *Strickland* unreasonably; it is the unreasonableness inquiry that is the "doubly deferential" standard, not that "[t]he likelihood of a different result must be substantial, not just conceivable."

Therefore, we conclude that the district court applied the correct standard to analyze Dunlap's *Strickland* claims that Dunlap's defense team was ineffective in failing to investigate and present certain mitigating evidence.

   2.   The district court did not err when it concluded that Dunlap's defense team was not ineffective in investigating and presenting mitigating evidence.

Dunlap next argues that his defense team was ineffective because more evidence of his family life and background should have been presented. At the second evidentiary hearing, Dunlap presented testimony from: his brother, Mark Dunlap; his sister, Suzanne Nelson; and his mother, Patricia Henderson; each of whom also testified at the 2006 resentencing hearing. Dunlap also presented testimony from several witnesses who did not testify at the 2006 resentencing hearing. Roy Prince, a teacher at Dunlap's high school, testified that, though he did not know Dunlap well and had never actually taught him, he thought Dunlap was "out there" and "didn't fit in" except "with the theater people." Prince further testified that "it looked . . . like a lot of the kids at the high school were afraid of" Dunlap. Mark Baize, a high school friend of Dunlap, testified that he was good friends with Dunlap, but that Dunlap was "shunned [by] a lot" of the other students. Baize further testified that he had never been contacted by anyone on Dunlap's defense team prior to the resentencing hearing but that, if he had, he would have been willing to testify. Paul Locket, Dunlap's high school math teacher, testified that Dunlap had low grades in school and had attempted to "form an army." Jennifer Davidson, Dunlap's ex-wife, testified about her relationship with Dunlap and its eventual decline. She recounted disturbing stories she learned from Dunlap's parents about Dunlap growing up involving potential arson and animal cruelty, and the mental health issues experienced by the son she shares with Dunlap. Davidson further testified that she had never been contacted by anyone on Dunlap's defense team prior to the resentencing hearing but that, if she had, she would have been willing to testify. After considering the testimony of each witness, the district court found that Dunlap had failed to satisfy either prong of *Strickland*.

On appeal, Dunlap first argues that the testimony presented at the resentencing hearing—that of his brother, sister, and mother—was presented ineffectively, contending that defense counsel "did little to guide" his mother's testimony. Dunlap also argues that defense counsel should have presented the testimony of additional witnesses, such as Dunlap's teachers and childhood friends. Particularly, Dunlap contends that the defense team should have presented testimony from his ex-wife at the resentencing hearing, as she could have attested to both his odd behavior during their marriage and subsequent divorce, as well as to the mental health issues experienced by their son.

"'[C]ounsel's choice of witnesses, manner of cross-examination, and lack of objection to testimony fall within the area of tactical, or strategic, decisions, as does counsel's presentation of

medical evidence.'" *Abdullah*, 158 Idaho at 500, 348 P.3d at 115 (quoting *Giles v. State*, 125 Idaho 921, 924, 877 P.2d 365, 368 (1994)). "For additional mitigation evidence to demonstrate prejudice in a post-conviction proceeding, it simply cannot be cumulative of evidence presented at sentencing, but rather must create a substantial likelihood of a different sentence." *Id.* at 495, 348 P.3d at 110.

In *Abdullah*, this Court held that defense counsel was not ineffective in failing to present additional mitigation evidence from the defendant's family members. *Id.* at 492, 348 P.3d at 107. The evidence in question included traumatic events witnessed or experienced by the defendant. *Id.* This Court held that, although the proffered evidence was "undoubtedly heartfelt, emotional, vivid, and moving," it was cumulative of other evidence presented by counsel. *Id.* "The decision to present a fewer number of witnesses than [the defendant] would now prefer on appeal is a conceivable tactical decision. Under the deferential *Strickland* standard, this decision is 'strongly presumed' to be reasonable." *Id.* As such, this Court held that the defendant's counsel was not deficient in its presentation of mitigation evidence on the defendant's background and family life. *Id.* at 493, 348 P.3d at 108.

Here, Dunlap's defense team presented an array of mitigating evidence from Dunlap's immediate family, as well as from his first-grade teacher. The defense team's choices regarding which witnesses to call is generally a strategic decision afforded deference under *Strickland*. *See Dunlap V*, 155 Idaho at 387, 313 P.3d at 43. Dunlap cannot simply assert on appeal that defense counsel should have put on more witnesses, especially when the additional witnesses would have offered similar testimony to that already presented. *See Abdullah*, 158 Idaho at 492, 348 P.3d at 107.

Also, even though Baize testified at the second evidentiary hearing that he would have been willing to testify at the resentencing hearing in 2006, the district court noted that Dunlap's defense team was aware that Baize was a potential witness. Baize, however, had apparently been contacted by an investigator for Dunlap's original sentencing in 1992 and, according to the investigator's notes, told the investigator "if your [sic] looking for somebody to say nice things about [Dunlap] you came to the wrong place." The investigator described Baize as "angry" at Dunlap "almost to the point of being vindictive." Whether or not the investigator's notes reflect the truth of Baize's feelings about Dunlap in 1992, the notes are reflective of the information Dunlap's resentencing

defense team had when making the decision whether to investigate Baize. Given this background, we cannot say that refusing to further investigate Baize was not objectively reasonable.

Furthermore, the evidence Dunlap argues should have been presented includes evidence of the genetic component of his mental illness and additional "humanizing" evidence of Dunlap's good character. However, as found by the district court, Beaver's expert psychological testimony acknowledged that Dunlap's son's mental illness supported a genetic component to Dunlap's own mental illness. Additionally, Cunningham testified that there is a genetic predisposition to the mental disorders suffered by Dunlap. Thus, any additional testimony offered by Dunlap's mother or ex-wife regarding the mental health issues of family members would have been cumulative.

The humanizing evidence Dunlap alleges should have been introduced would also have been cumulative. Dunlap's mother, brother, and sister each testified to positive qualities possessed by Dunlap, as well as his progression of mental health issues. Both Dunlap's first-grade teacher and the judge who committed Dunlap to a mental health hospital testified to the progression of Dunlap's struggle with mental illness. As such, additional anecdotes of Dunlap's character and mental illness would have been cumulative and unlikely to have changed the outcome.

We conclude Dunlap's defense team was not deficient in choosing to limit its mitigation witnesses to certain family and friends of Dunlap. Therefore, we hold that the district court did not err when it concluded that Dunlap's defense team was not ineffective in presenting evidence of Dunlap's family life and background.

> b. *The district court correctly concluded that Dunlap's defense team was not ineffective in presenting evidence of the connection between Dunlap's mental illness, medication, and behavior at IMSI.*

Dunlap next alleges his defense team should have presented evidence of the connection between his mental illness, medication (or lack thereof), and behavior while incarcerated at IMSI. The district court concluded that the defense team was not ineffective in failing to do so. The district court first found that Judge Harding had employed rigid timing and funding restraints on the defense team. The district court also found that Dapsauski had provided Beaver with a timeline on which he could base his testimony and to help him prepare his testimony. Further, the district court acknowledged that even though the materials provided to Beaver "were not organized in a manner perhaps accustomed to by Dr. Beaver" that did not mean that counsel were deficient, particularly because both Beaver and Cunningham were able to provide testimony "addressing the

16

connection between Dunlap's mental illness, medication, and behavior during his confinement at IMSI." The district court continued:

> Finally, the Dunlap Defense Team's determination to rely solely upon Dr. Beaver not only to testify concerning his testing, evaluation and opinions, but to narrate a summary of Dunlap's medical and mental health records, including those maintained at IMSI was a tactical decision and arrived at by the Dunlap Defense Team after consideration, discussion and an exercise of professional judgment.

Therefore, the district court found that Dunlap did not establish deficient performance or prejudice to warrant post-conviction relief.

On appeal, Dunlap argues that

> [c]ounsel's failures to link [Dunlap]'s disciplinary and behavioral issues with the absence of antipsychotics, and their failure to link [Dunlap]'s good behavior to his receipt of proper psychiatric medication, resulted from their failure to review, analyze, and understand [Dunlap]'s IMSI records. If they had, they would have discovered every DOR [Disciplinary Offense Report] occurred when [Dunlap] was unmedicated, but when properly medicated, [Dunlap] is neither violent nor dangerous and does not get DORs. The district court's contrary conclusion, [sic] is erroneous and not supported by substantial evidence.

Dunlap focuses on a "timeline" that, under prevailing professional norms, should have been used to assist the jury in understanding the connection between Dunlap's mental illness symptoms and whether he was taking any medication for those symptoms.

In response, the State argues that Beaver presented the connection between Dunlap's mental health and whether he was taking any medications. Broadly, the State asserts that Dunlap's chief complaint is that counsel chose to rely on Beaver as its primary expert witness, instead of relying on multiple witnesses, which the State notes is in direct contravention of Judge Harding's ruling that only one expert would be appointed to the defense. In short, the State argues that Dunlap did not receive ineffective assistance because only Beaver testified about Dunlap's mental health.

In reply, Dunlap contends that "the State's arguments excusing counsel's shortcomings by pointing to resource limits, imposed by yet another state actor, the district court judge, is inappropriate." Dunlap argues that, at the evidentiary hearing, the defense team "never said their investigation, analysis, argument[,] or presentation of mitigating evidence, or their rebuttal of the State's aggravation case, was curtailed by time or resource limits imposed by the district court" but "was based on just [their] own decision."

Once again, this Court has maintained a deferential standard when reviewing defense counsel's tactical choices: "'counsel's choice of witnesses, manner of cross-examination, and lack

17

of objection to testimony fall within the area of tactical, or strategic, decisions, *as does counsel's presentation of medical evidence.*'" *Abdullah*, 158 Idaho at 500, 348 P.3d at 115 (quoting *Giles*, 125 Idaho at 924, 877 P.2d at 368) (italics added).

Dunlap has failed to meet his burden in establishing deficient performance. At the evidentiary hearing, Archibald testified that, in his experience, most jurors tended not to trust mental health experts anyway:

> My personal experience about mental health evidence is juries don't believe a lot of it anyway, whether it's for you or against you. I've never had a jury say wow, we really hung on every word that psychologist said. I've never had a jury member say that. Most jury members have said we didn't really pay much attention to the expert.

The defense team's decision to present the medical evidence through Beaver's testimony was strategic and thus, their performance does not fall below an "objectively reasonable" standard.

Additionally, Dunlap has failed to establish prejudice. For example, Matthews testified at the resentencing hearing about the tenuous link between a medication and a diagnosis:

> I do know that a combination of Thorazine and Haldol which was the kind of combination which was mostly used when I was in medical school, that there is no rational reason for combining those two medicines. That it has been suggested to you that he must be very sick because he is taking Haldol and Thorazine[—]by no means is that true. What it means is he has been on an inappropriate combination of medicine that has no indication in psychiatry. So I will encourage the jury not to draw any conclusions from the fact he is taking medication. You don't conclude that someone has a particular sickness because they are taking medicines that might be prescribed for that sickness.

Matthews was then asked, "What if the clinician starts a patient on this particular medicine and concludes that he seems to be doing okay with that particular medicine[, i]s that reflective of an actual diagnosis of whether it is schizo-affective disorder or any other disorder for that matter?" Matthews responded:

> You cannot use response to treatment alone as an indicator that a person has a particular illness, and why not? Well, for a bunch of reasons. *One is that he may be faking the illness to begin with.* That is probably what the situation is for Mr. Dunlap, but also maybe the medicine treats other conditions than the one that you've diagnosed. So you can't say that just because he seems okay on the medicine that he has, that particular illness which you think the medicine should be used for.

(Italics added.) Thus, had the defense team provided the jury with the timeline now suggested by Dunlap, there is every possibility that the jury could have used that timeline to corroborate Matthews' testimony that Dunlap was feigning mental illness. The jury could have reasonably

concluded that the reason Dunlap was well behaved when he was on medication was all an act to convince others he was mentally ill. We cannot say that, but for counsel's failure to provide the jury with a "timeline," there is a reasonable probability that Dunlap would have received a sentence other than death.

Furthermore, Dunlap's argument that timing and budgeting issues were caused by the district court is precluded by his own admission that his defense team "never said their investigation, analysis, argument[,] or presentation of mitigating evidence, or their rebuttal of the State's aggravation case, was curtailed by time or resource limits imposed by the district court" but "was based on just [their] own decision." While Dunlap's argument is unavailing under these particular facts, we do not condone the practice of the same judge overseeing both a capital trial and sentencing proceedings as well as making financial decisions related to the funding of defense experts. In our view, the best practice is to, pursuant to Idaho Criminal Rule 12.2(d), utilize a second, disinterested "resource judge" to make decisions relating to the defense budget, including the number of expert witnesses that may be retained. *See* I.C.R. 12.2(d).

Nevertheless, under the particular facts of this case, we hold that the district court did not err when it concluded that Dunlap's defense team was not ineffective in presenting evidence of the connection between Dunlap's mental illness, medication, and behavior at IMSI.

> c. *The district court correctly concluded that Dunlap was not prejudiced by his defense team's deficient performance in failing to present evidence from Caribou County Jail personnel and inmates.*

Dunlap next contends that his defense team was ineffective because it failed to adequately investigate, interview, and call witnesses who had interacted with Dunlap during the time he was incarcerated in the Caribou County Jail. Prior to the evidentiary hearing, Dunlap produced affidavits from several individuals who were either employed by or incarcerated at that jail, including Sheriff's deputies and Dunlap's cellmates. Most of these witnesses did not testify at the second evidentiary hearing; however, Dunlap submitted their affidavits. One witness did testify: James Clark, a former inmate at the Caribou County Jail who shared a cell with Dunlap. Clark's testimony described Dunlap's behaviors relating to his mental health and other interactions he had with Dunlap. Clark further testified that "he was never contacted or asked to testify at Dunlap's resentencing trial by the Dunlap Defense Team."

The district court stated it "ha[d] considered Clark's testimony and ha[d] reviewed the Affidavits of those Caribou County Jail Personnel who submitted affidavits." The district court

then concluded that Dunlap's defense team was deficient in failing to investigate or interview any individuals from the jail:

> it appears to this [c]ourt that the Dunlap Defense Team would want to develop and present testimony to the jury concerning Dunlap's mental well-being and state which was as current as possible. . . . [T]o not investigate, interview, and call someone to verify Dunlap's mental condition and ongoing symptoms consistent with Dr. Beaver's diagnosis appears to this [c]ourt to be deficient under the first *Strickland* prong.

The district court next found that although the defense team was deficient, this deficiency did not "undermine the [c]ourt's confidence in the outcome of the resentencing hearing." The district court found that the disputed testimony was "much the same" as other testimony offered by Dunlap's friends, family, and mental health professionals.

On appeal, Dunlap contends that the jail personnel and inmate evidence was not cumulative of any other evidence before Dunlap's jury. Dunlap asserts that there was no evidence of Dunlap's behavior while he was incarcerated in the jail, and such evidence would have "cast doubt" on Dunlap's "continuing threat to society and risk of future danger." (Citing *Skipper v. South Carolina*, 476 U.S. 1, 4–5 (1986).) Dunlap asserts that this evidence was "independently mitigating," and its absence caused prejudice to Dunlap because there was a likelihood that at least one juror would have rejected a sentence of death had it been presented.

In response, the State first challenges the district court's finding of deficiency, arguing that the defense team "arguably" knew of the potential witnesses from the jail and chose not to present their testimony as part of its strategy. The State also contends that the district court properly considered all the evidence when concluding that Dunlap suffered no prejudice.

In reply, Dunlap first asserts that the State has not properly challenged the district court's finding of deficiency on appeal. Dunlap continues that the deficiency finding is supported by the evidence, but that failing to include this evidence was prejudicial. Dunlap alleges that evidence of his behavior while in the jail demonstrated Dunlap's ability to "live peaceably with multiple people in a congregate setting." This evidence, Dunlap argues, was "crucial to dispelling the State's claim that [Dunlap] constitutes a continuing threat to society."

Because we conclude Dunlap has failed to establish prejudice, we need not decide whether the State has properly challenged the district court's deficiency finding. "To prove that counsel's deficient performance prejudiced the defendant, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

20

would have been different.'" *Dunlap v. State*, 159 Idaho 280, 297, 360 P.3d 289, 306 (2015) ("*Dunlap VI*") (quoting *Strickland*, 466 U.S. at 688). "A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. The likelihood of a different result must be substantial, not just conceivable." *Abdullah*, 158 Idaho at 418, 348 P.3d at 33 (citations and quotations omitted).

Here, Cunningham's original testimony was read to the jury. Cunningham testified at length about Dunlap's potential for future dangerousness, specifically within the prison system. While the testimony of Clark may have presented a more recent picture of Dunlap's dangerousness in a prison setting, we find the district court did not err in concluding there was not a reasonable probability that the omitted evidence would have resulted in a different verdict.

Additionally, Dunlap's reliance on *Skipper* is inapposite. In *Skipper*, the defendant had spent seven and a half months in jail awaiting his capital sentencing hearing. 476 U.S. at 3. Both the defendant (Skipper) and his ex-wife testified that he had behaved well during his stint in jail. *Id.* The defendant also "sought to introduce testimony of two jailers and one 'regular visitor' to the jail to the effect that [the defendant] had 'made a good adjustment' during his time spent in jail." *Id.* The trial court, finding the proffered testimony to be irrelevant, precluded the defendant from calling any of the three witnesses. *Id.* The Supreme Court reversed, stating that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." *Id.* at 5. The Supreme Court continued,

> the State seems to suggest that exclusion of the proffered testimony was proper because the testimony was merely cumulative of the testimony of petitioner and his former wife that petitioner's behavior in jail awaiting trial was satisfactory, and of petitioner's testimony that, if sentenced to prison rather than to death, he would attempt to use his time productively and would not cause trouble. We think, however, that characterizing the excluded evidence as cumulative and its exclusion as harmless is implausible on the facts before us. The evidence petitioner was allowed to present on the issue of his conduct in jail was the sort of evidence that a jury naturally would tend to discount as self-serving. The testimony of more disinterested witnesses—and, in particular, of jailers who would have had no particular reason to be favorably predisposed toward one of their charges—would quite naturally be given much greater weight by the jury. Nor can we confidently conclude that credible evidence that petitioner was a good prisoner would have had no effect upon the jury's deliberations. The prosecutor himself, in closing argument, made much of the dangers petitioner would pose if sentenced to prison, and went so far as to assert that petitioner could be expected to rape other inmates. Under these circumstances, it appears reasonably likely that the exclusion of evidence bearing upon petitioner's behavior in jail (and hence, upon his likely

21

future behavior in prison) may have affected the jury's decision to impose the death sentence. Thus, under any standard, the exclusion of the evidence was sufficiently prejudicial to constitute reversible error.

*Id.* at 7–8.

Clearly, the facts here do not align with those in *Skipper*. At the resentencing hearing, the prosecutor focused his closing arguments on the facts of the crime itself. While the prosecutor did briefly comment on Dunlap's future dangerousness, the comment was aimed at convincing the jury to consider Dunlap's future dangerousness to society, not in prison, when considering the propensity aggravator. Unlike in *Skipper*, the prosecutor did not state that Dunlap would be a danger to other inmates or prison staff. Additionally, Dunlap had a "disinterested witness," Cunningham, describe Dunlap as lacking the potential for future dangerousness within the prison system. The additional evidence Dunlap now argues should have been presented at the resentencing hearing comes much closer to "cumulative" than the additional evidence in *Skipper*. Again, while the additional testimony of Dunlap's cellmate and others may have offered a more recent picture of Dunlap's dangerousness in a prison setting, we remain unconvinced it establishes a reasonable probability that Dunlap would not have received a death sentence.

Accordingly, we conclude that the district court did not err when it concluded that Dunlap's defense team was not ineffective when they failed to present evidence from Caribou County Jail personnel and inmates.

> ### d. The district court correctly concluded that Dunlap was not prejudiced by his defense team's cross-examination and rebuttal of Matthews.

Dunlap next argues that his defense team failed to adequately cross-examine and rebut Matthews' testimony. The district court found that it was

> an extremely close call concerning whether the Dunlap Defense Team's performance relative to the cross-examination of Dr. Matthews, their decision not to call Dr. Beaver to rebut Dr. Matthews' testimony[,] and their decision not to call others affiliated with IMSI such as Dr. Khatain, Dr. Sombke, Creswell[,] and others constituted deficient performance under the first *Strickland* prong. While the [c]ourt recognizes that many of these determinations can be viewed as strategic and professional judgment determinations, it also seems to this [c]ourt that some additional effort should have been made to minimize Dr. Matthews' testimony.

The district court further recognized that Matthews was a particularly damaging witness, noting that

> [w]hile this [c]ourt did not have the opportunity to see Dr. Matthews testify live, the [c]ourt's review of Dr. Matthews' testimony established, at least in this [c]ourt's

22

mind, that Dr. Matthews was a powerfully persuasive expert. He had a way of expressing himself that was very confident, authoritative, and compelling, perhaps even to a greater degree than other experts and/or mental health witnesses whose testimony the [c]ourt reviewed from the resentencing or even observed live at the evidentiary hearing.

However, the district court did not reach a finding as to whether Dunlap's defense team performed deficiently; "[r]ather," the district court concluded, "regardless of how this [c]ourt may have come down on the issue of deficient performance, Dunlap has failed to establish prejudice."

On appeal, Dunlap makes several related arguments, but each comes down to the same essential contention: that Archibald failed to adequately prepare for his cross-examination of Matthews. Dunlap argues that the defense team failed to provide a DVD copy of Matthews' interview of Dunlap to Beaver in time for Beaver to review the interview and thus prevented Beaver from assisting the defense team in preparing them to cross-examine Matthews. Dunlap also faults Archibald for failing to sit in on the interview or review the DVD himself.

Dunlap next argues that Archibald should have "ask[ed] Matthews to explain Khatain's numerous notes in [Dunlap]'s IMSI files," in order to rebut Matthews' testimony and prevent Matthews from "undermining Beaver's opinion." Had Archibald asked Matthews about the notes, Dunlap contends, it would have been obvious that Khatain had seen Dunlap on a regular basis and made Beaver's reliance on Khatain's notes more credible.

Finally, Dunlap argues that the defense team thoroughly failed to rebut Matthews' "damning" testimony by failing to adequately cross-examine Matthews or call witnesses—both expert and fact—to rebut Matthews. Dunlap points to the defense team's failure to call Beaver to the stand again after Matthews had testified, claiming that Beaver could have "provide[d sur]rebuttal testimony." Dunlap also contends that the defense team could have called Khatain, Sombke, or others to rebut Matthews' testimony that Dunlap "convincingly faked his mental illness and fooled IMSI mental health professionals into believing he was mentally ill, and they only recognized he was faking it when he told them." Dunlap also points to the district court's characterization of Matthews as a particularly persuasive witness and argues that "[w]here even the district judge fell prey, any cursory review of Matthews' testimony reveals how damaging it was to [Dunlap]'s case left unchallenged," thus establishing prejudice under *Strickland*.

The State contends that Archibald did prepare for the cross-examination of Matthews. The State argues that the reason the defense team did not review the DVDs prior to Matthews' testimony was "because of other priorities associated with the resentencing that had already

commenced." Archibald's performance was not deficient, the State claims, due to "the time restraints that were imposed by Judge Harding for the resentencing, counsels' need to focus upon other tasks, and counsels' reliance upon Dr. Beaver to review the tapes before he testified . . . ." The State also points out that "Archibald attempted to attend the interview with Dunlap, but was asked by Dr. Matthews not to be in the same room during the interview."

The State next argues that Archibald made a strategic decision "to not highlight" Matthews' testimony regarding Khatain's notes "because twelve clinic visits as opposed to five clinic visits over the course of five years is hardly a significant difference, particularly when Dr. Matthews concluded his statement with 'I don't actually know [how many times Khatain examined Dunlap].'" The State also contends that the defense team's decision not to call Beaver back to the stand to rebut Matthews was a "tactical decision." The State maintains that "a plethora of expert mental health evidence was presented to the jury by both the [prosecution] and Dunlap from the time he was a child through the time of the resentencing" and any additional fact witnesses Dunlap now argues the defense team should have called to the stand would simply have offered repetitive evidence.

In reply, Dunlap argues that "the State's challenge to the district court's deficiency finding is not before this Court." However, like the district court below, we need not reach the question of deficient performance because we conclude Dunlap has failed to establish prejudice.

> "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699–700. Thus, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* The United States Supreme Court has stated: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

*Dunlap VI*, 159 Idaho at 297, 360 P.3d at 306.

Regarding the DVDs of Matthews' interview, Dunlap has provided no facts to support that the DVD could have been provided to Beaver sooner than it was. Dunlap admits that, once his defense team possessed the interview DVDs, the DVDs "were overnighted to Beaver." The only way the defense team could have gotten more time to review the DVD was if the defense team had moved for another continuance. However, the district court found that the defense team's belief that another continuance would not have been granted was reasonable: "[t]his opinion was a direct

24

product of previous statements made by the trial court." Because the motion would almost certainly not have been granted, Dunlap was not prejudiced by his defense team's failure to move for a continuance. *See Abdullah*, 158 Idaho at 487, 348 P.3d at 102.

As for Archibald's failure to sit in on the interview, this Court has already found that this was not deficient performance:

> Dunlap argues that he was denied effective assistance of counsel by his attorneys' decision not to attend Dunlap's interview with Dr. Matthews . . . . Significantly, however, the U.S. Supreme Court explicitly observed that [*Estelle*] did not address the presence of counsel during the examination, noting that the Court of Appeals had recognized that "an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination." Thus, [] counsel was not constitutionally required to be present during Dr. Matthews' interview . . . .

*Dunlap V*, 155 Idaho at 387–88, 313 P.3d at 43–44 (quoting *Estelle*, 451 U.S. at 471 n. 14). Because this Court already found that Archibald "was not constitutionally required to be present during Matthews' interview," Dunlap is precluded from arguing this "error" prejudiced him during the instant appeal under the law of the case doctrine:

> The law of the case doctrine, which is well settled in Idaho, requires that when an appellate court, in "deciding a case presented states in its opinion a principle or rule of law necessary to the decision, such pronouncement becomes the law of the case, and must be adhered to throughout its subsequent progress, both in the trial court and upon subsequent appeal[.]" "The underlying purpose of the doctrine is to 'maintain consistency and avoid reconsideration of matters once decided during the course of a single, continuing lawsuit . . . .'"

*State v. Gorringe*, ___ Idaho ___, ___, 481 P.3d 723, 727 (2021) (quoting *Berrett v. Clark Cnty. Sch. Dist. No. 161*, 165 Idaho 913, 921–22, 454 P.3d 555, 563–64 (2019)). Therefore, Dunlap has not established prejudice.

Dunlap's next argument is that Archibald should have asked Matthews to explain Khatain's "numerous notes" during cross-examination. While Matthews' testimony clearly painted Khatain in an unfavorable light, Matthews was an experienced expert witness and continuously challenged Archibald's characterizations of Matthews' previous testimony on cross-examination. Given this, it is likely that, had Archibald attempted to ask Matthews more questions, it would have simply given Matthews further opportunities to undermine Khatain's treatment and evaluation of Dunlap. As such, Dunlap has failed to establish prejudice.

We next address Dunlap's argument that his defense team failed to rebut Matthews' "damning" testimony by failing to call witnesses—both expert and fact—to rebut Matthews.

25

Dunlap argues specifically that the defense team should have re-called Beaver to the stand as an expert witness and should have called Khatain and Sombke to the witness stand as "fact witnesses" to dispute Matthews' characterization. Given the amount of testimony regarding Dunlap's mental illness, from his family members as well as Cunningham and Beaver, we cannot say that the additional testimony of one or even all three potential witnesses would have swayed the jury to impose a sentence less than death. Weighing the evidence that could have been offered against what was offered at the resentencing hearing, we conclude that Dunlap has not shown there is a reasonable probability his sentence would have been different. Dunlap has failed to establish prejudice.

Because our confidence in Dunlap's death sentence is not undermined, we hold that the district court did not err when it concluded that Dunlap was not prejudiced by his defense team's cross-examination and rebuttal of Matthews.

> *e. The district court correctly concluded that Dunlap was not prejudiced by his defense team's failure to object to Matthews' improper bolstering testimony.*

Dunlap next alleges that his defense team was ineffective because they failed to object to improper bolstering by Matthews. When addressing this claim, the district court stated

> [t]he [c]ourt agrees with the assessment of the State that the issue of improper bolstering relative to Dr. Matthews' testimony and Dunlap's Defense Team's failure to object, was certainly objectionable and potentially amounted to ineffective assistance of counsel under the first *Strickland* prong. However, just as the Idaho Supreme Court concluded that this was "harmless error" (*See Dunlap V*, 155 Idaho 345, 371, 313 P.3d 1, 27), this [c]ourt concludes that this failure did not rise to the level of prejudice under a *Strickland* analysis.

On appeal, Dunlap argues that "Matthews' testimony bolstered reports of non-testifying witnesses that supported his malingering opinion and repeatedly invaded the province of the jury." Dunlap concedes that Matthews' bolstering testimony has already been considered by this Court and found to be "harmless error" under the fundamental error doctrine; however, Dunlap contends

> [n]evertheless, given the importance of Matthews' testimony to support the State's "not mentally ill"/malingering theory—which went virtually unchallenged—it is hard to imagine Matthews' improper bolstering had no prejudicial impact on [Dunlap]'s jury. This is particularly true in the sentencing phase of a capital trial where only one juror needs to be persuaded to choose life over death. Not only did counsel fail to present testimony from the IMSI professionals Matthews' maligned and who would have contradicted Matthews' narrative of their incompetence, counsel did not even bother to present IMSI records written by the same professionals. These records would have undermined Matthews' bolstering

testimony with evidence IMSI mental health professionals considered but rejected the notion that [Dunlap] malingered mental illness, only after years of observing and treating him. The district court's finding that [Dunlap] was not prejudiced is clearly erroneous.

The State essentially argues that this Court's previous determination that the improper bolstering testimony was harmless error should control the prejudice analysis here. While the State has recognized that the prejudice standard in *Strickland* differs from the harmless error standard, it urges this Court to follow the reasoning from *Chapman v. California*, 386 U.S. 18 (1967), and conclude that "[t]here is little, if any difference between . . . whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24. The State further argues that "Dunlap has failed to establish deficient performance" because "the manner in which witnesses are cross-examined is a tactical decision."

Had Dunlap's defense team timely objected to the bolstering testimony, the trial court likely would have sustained the objection to such a "clear violation" of IRE 702. *See Dunlap V*, 155 Idaho at 370, 313 P.3d at 26. Thus, Dunlap has established deficient performance. *See Abdullah*, 158 Idaho at 530, 348 P.3d at 145. In fact, this Court previously determined Matthews' bolstering testimony to have been error. *Dunlap V*, 155 Idaho at 370, 313 P.3d at 26. It therefore follows that Dunlap's counsel was ineffective in not objecting to Matthews' bolstering testimony. However, this Court has already found that the admission of evidence through Matthews' improper bolstering was harmless. *Id.* at 371, 313 P.3d at 27 ("Although [Matthews' bolstering] constituted prosecutorial misconduct, we find the error to be harmless."). Under this Court's enunciation of the "harmless error" test, "[h]armless error is 'error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" *State v. Garcia*, 166 Idaho 661, 674, 462 P.3d 1125, 1138 (2020) (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991)). "Proper application of the *Yates* two-part test requires weighing the probative force of the record as a whole while excluding the erroneous evidence and at the same time comparing it against the probative force of the error." *Id.* "When the effect of the error is minimal compared to the probative force of the record establishing guilt 'beyond a reasonable doubt' without the error, it can be said that the error did not contribute to the verdict rendered and is therefore harmless." *Id.* (quoting *Yates*, 500 U.S. at 404–05).

Thus, a finding of harmless error required that this Court conclude that "the error *did not contribute* to the verdict rendered . . . ." *See id.* (italics added). If an error did not contribute to the imposition of the death sentence, it cannot be said "it is 'reasonably likely' the result would have been different" without the error. *See Harrington*, 562 U.S. at 111 (quoting *Strickland*, 466 U.S. at 696).

Therefore, we necessarily hold that the district court did not err when it concluded that Dunlap's defense team was not ineffective for failing to object to Matthews' improper bolstering testimony.

> f. *The district court correctly concluded that Dunlap's defense team was not ineffective in relying on Dunlap's family's testimony and Dunlap's allocution to show remorse.*

Dunlap next contends his defense team should have introduced more evidence showing his remorse. On the final day of Dunlap's resentencing hearing, Dunlap presented his allocution statement to the jury. Mark Dunlap, Dunlap's brother, also testified at the resentencing to the remorse felt by Dunlap and his family. Parmenter testified at the second evidentiary hearing that Mark's testimony was particularly moving and emotional and seemed to resonate with the jury and "bring tears to their eyes."

The district court found that the defense team had knowledge of a letter written by Dunlap to Tonya Crane's husband. Parmenter explained that the way the letter had been written, including Dunlap's discussion of his medications and issues with his ex-wife, "might have been part of the reason . . . that we might not have submitted" it into evidence. Parmenter also acknowledged that it was the defense team's "call" on whether to call additional witnesses that could testify to Dunlap's remorse. The district court stated:

> While this [c]ourt may well have used a combination of family testimony concerning Dunlap's remorse, Dunlap's allocution, and some other collateral witnesses to bolster this remorse testimony, the [c]ourt cannot say that the Dunlap Defense Team's exercise of professional judgment in determining to rely heavily, if not exclusively, upon family testimony and Dunlap's allocution, was deficient.

The district court then concluded that Dunlap had failed to show prejudice as well because it was not substantially likely that the presentation of additional remorse evidence would have changed the outcome.

On appeal, Dunlap argues that due to the crucial nature of remorse evidence, Dunlap's resentencing counsel should have presented additional evidence, including the letter Dunlap wrote

the victim's husband. Dunlap also points out that counsel were aware that, at the time he gave his allocution statements, Dunlap had a flat affect and was unable to express his true remorsefulness. Dunlap argues that his counsel knew the allocution statement was strange and did not go over well with the jury, and that counsel should have reevaluated what other remorse evidence they knew to be in existence and could be presented to the jury. Finally, Dunlap argues that due to the powerful nature of remorse evidence, counsel's failure was prejudicial because at least one juror may have struck the balance in favor of life over death.

In response, the State first contends that Dunlap improperly expanded his remorse claim on appeal by arguing evidence in addition to the letter to the victim's husband should have been admitted. The State argues that the district court's decision on this issue should be affirmed on this basis alone. The State next asserts that there were strategic reasons defense counsel chose not to submit the letter to the jury. The State also points to Parmenter's statements that, while aware of other potential witnesses that could have been called, the defense team chose not to because of Mark's compelling testimony and Dunlap's allocution. The State contends that these decisions by the defense team were purely strategic and tactical, and as such may not be second-guessed. (Citing *Abdullah*, 158 Idaho at 500, 348 P.3d at 115.)

As a preliminary matter, we reject the State's contention that Dunlap is raising new arguments on appeal. Specifically, the State maintains that Dunlap's Petition only claimed deficient performance with respect to Dunlap's letter to the victim's husband. This is inaccurate. At the close of the evidentiary hearing on the ineffective assistance of counsel claims, Dunlap submitted proposed findings of fact and conclusions of law to the district court. Dunlap specifically discussed and objected to counsel's failure to present evidence of the letter, in addition to calls to local radio stations expressing remorse and conversations Dunlap had with inmates at the Caribou County Jail expressing remorse. Therefore, we conclude that Dunlap has properly preserved this issue and may argue that remorse evidence outside of the letter to the victim's husband should have been introduced.

However, "strategic and tactical decisions will not be second guessed or serve as a basis for post-conviction relief under a claim of ineffective assistance of counsel unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law or other shortcomings capable of objective review." *Abdullah*, 158 Idaho at 500, 348 P.3d at 115 (quoting *Pratt v. State*, 134 Idaho 581, 584, 6 P.3d 831, 834 (2000)). "This Court held, in *State v. Row*, that

29

counsel is not required to investigate a defendant's 'entire life in order to objectively present . . . mitigation evidence' and that decisions regarding mental health and allocution statements are 'strictly strategic and shall not be second-guessed by this Court.'" *Dunlap V*, 155 Idaho at 388, 313 P.3d at 44 (citing *Row*, 131 Idaho at 313, 955 P.2d at 1092).

Here, Parmenter noted that the letter Dunlap wrote to the victim's husband could be troubling to the jury: it contained references to Dunlap's medications, as well as his refusal to be taken to a mental hospital and issues he was having with his ex-wife. As found by the district court, Parmenter's decision not to submit the letter was a strategic or tactical decision made in order to limit distractions from Dunlap's family's testimony and his allocution statement. Further, any additional remorse evidence would not have created a substantial likelihood that the outcome would have been different. Parmenter and Archibald both testified that they, as well as the jury, were emotionally moved by Mark Dunlap's testimony regarding Dunlap's and his family's remorse.

Therefore, we hold that the district court did not err when it concluded that Dunlap's defense team was not ineffective in relying on Dunlap's family's testimony and Dunlap's allocution to show remorse.

> g. *The district court correctly concluded that Dunlap's defense team was not ineffective in arguing for admission of the 1995 note from Dr. Estess.*

Dunlap next faults his defense team for not admitting the 1995 medical chart notes from Dr. Michael Estess. At the resentencing hearing, Parmenter sought to introduce the medical chart notes, which indicated Dunlap was mentally ill. Judge Harding declined to admit the notes. Estess had purportedly rendered an opposite opinion in 1992 that Dunlap was not mentally ill which had been admitted (in error) in Dunlap's initial case. *See Dunlap V*, 155 Idaho at 379, 313 P.3d at 35. The district court concluded that Dunlap had "failed to establish what more Parmenter or the Dunlap Defense Team could have done to prevail" in getting this evidence admitted. The district court continued: "Judge Harding appeared to be very entrenched relative to his position on this issue and his concern for error if this material was relied upon by Dr. Beaver." The district court concluded that Dunlap failed to establish deficiency or prejudice due to the defense team's failure to adequately argue for admission of the note.

Before the district court, Dunlap filed a motion to reconsider on the ineffective assistance of counsel claims, arguing in part that the district court's finding that Dunlap "failed to show what arguments counsel could have made to admit [the note] is not supported by competent and

substantial evidence." The thrust of Dunlap's argument is that, had Parmenter argued to Judge Harding the importance of the 1995 note for mitigation, the note would have significantly rebutted the State's malingering theory. Further, Dunlap asserted that Parmenter's failure to raise these arguments was "facially deficient and prejudicial."

In the State's response to Dunlap's motion to reconsider, the State argued that Dunlap raised the issue of Estess' 1995 note for the first time. The State next pointed out that the district court found that Parmenter made an "aggressive argument" in seeking to admit the note at the resentencing hearing, and it is unlikely that any additional argument advanced by Parmenter would have persuaded Judge Harding to admit it. The district court denied Dunlap's motion to reconsider, finding that Dunlap's defense team could have done nothing more to convince Judge Harding to admit the 1995 notes from Estess.

On appeal, Dunlap essentially reiterates his argument that counsel should have done more to get Estess' 1995 note admitted because it contained compelling mitigation evidence. Dunlap argues that this evidence "would have enhanced the strength of [Dunlap's] mental illness theme, undermined Matthews' credibility, and refuted the malingering theory."

In response, the State again alleges that Dunlap has failed to preserve the issues regarding Estess' 1995 note because there was "no mention of the claim during the evidentiary hearing, [and] there was [also] no mention of Dr. Estess." Next, the State asserts that "it is difficult to understand what more Parmenter could have done to convince [Judge Harding] to overrule the [S]tate's objection." Further, the State argues that "merely because Parmenter might have made the additional arguments advocated by Dunlap for the first time on appeal does not mean the district court's finding was clearly erroneous."

As a preliminary matter, we conclude that Dunlap preserved his argument regarding the 1995 treatment note from Estess. Dunlap raised the issue in both his Petition and Closing Argument. Furthermore, the district court fully decided the issue in its conclusions of law, holding that counsel were neither deficient nor that prejudice had resulted. "To state an arguable claim on appeal, 'both the issue and the party's position on the issue must be raised before the trial court for it to be properly preserved . . .'" *State v. Barr*, 166 Idaho 783, 786, 463 P.3d 1286, 1289 (2020), *as amended* (June 25, 2020) (quoting *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019)). "An exception to this rule, however, has been applied by this Court when the issue was argued to or *decided by* the trial court." *State v. DuValt*, 131 Idaho 550, 553, 961 P.2d 641, 644

31

(1998) (italics added). Not only did Dunlap raise the issue at multiple junctures below, but the district court clearly decided the issue. The State even concedes in its Respondent's Brief that Dunlap's Petition raised the issue, stating that "in his Petition, Dunlap contends counsel were ineffective by failing to argue admission of Dr. Estess' 1995 treatment notes." Thus, the State's argument that Dunlap failed to preserve this claim is unavailing.

"A trial court has 'broad discretion' in determining whether to admit or exclude evidence, 'and its judgment in the fact finding role will only be disturbed on appeal when there has been a clear abuse of discretion.'" *State v. Joy*, 155 Idaho 1, 6, 304 P.3d 276, 281 (2013) (quoting *State v. Watkins*, 148 Idaho 418, 421, 224 P.3d 485, 488 (2009)). "Where the alleged deficiency is counsel's failure to file a motion, *a conclusion that the motion, if pursued, would not have been granted by the trial court, is generally determinative of both prongs of the* Strickland *test.*" *Abdullah*, 158 Idaho at 487, 348 P.3d at 102 (quoting *Payne*, 146 Idaho at 562, 199 P.3d at 137) (alterations omitted) (italics added).

Here, the district court's conclusion that Parmenter could not have done anything more to admit Estess' 1995 note is supported by the evidence. First, the district court found that Parmenter "aggressively argued" for the admission of the evidence. That finding of fact is acknowledged by both parties. Additionally, the district court noted that Judge Harding was "entrenched" in his belief that any evidence related to Estess should not be admitted. Thus, even if Parmenter would have made the argument now presented by Dunlap on appeal, it "would not have been granted by the trial court." *See Abdullah*, 158 Idaho at 530, 348 P.3d at 145. As such, Dunlap has not established that Parmenter's argument was deficient. When a lawyer does all that can be done and is unsuccessful, it cannot be said his representation was ineffective. *See id.*

We therefore hold that the district court did not err when it concluded that Dunlap's defense team was not ineffective in arguing for admission of the 1995 note from Estess.

3. The district court did not err when performing the prejudice analysis under *Strickland* because it considered the totality of the evidence.

Finally, Dunlap argues that the district court considered counsel's deficiencies in isolation to determine that Dunlap had not been prejudiced, but that determining prejudice requires consideration of all the evidence presented to the resentencing jury and in post-conviction proceedings. Dunlap asserts that his defense team's overall "deficiencies had a pervasive effect on the inferences to be drawn from the evidence related to [Dunlap's] mental illness, and dramatically altered the evidentiary picture before the jury."

32

In determining whether a defendant received ineffective assistance of counsel, the court "must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

> Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695–96.

Here, the district court concluded that Dunlap's defense team was not deficient under *Strickland's* first prong in: investigating and presenting mitigation evidence of Dunlap's family history and background; presenting evidence of the connection between Dunlap's mental illness, medication, and behavior at IMSI; relying on Dunlap's allocution and family testimony for remorse; and inability to admit Estess' 1995 treatment note. Because we agree that these were not "errors" under *Strickland*, we conclude the district court did not err in refusing to consider these "errors" collectively.

The district court explicitly found that Dunlap's defense team was deficient in their investigation into Caribou County Jail personnel and inmates, and assumed without deciding that the defense team performed deficiently in failing to adequately cross-examine and rebut Matthews and failing to object to Matthews' improper bolstering. Thus, under a collective approach, the district court should have considered the cumulative effect of each of these "errors" in determining whether Dunlap was prejudiced by the deficient performance.

The district court did so. In finding the defense team's error in investigating the Caribou County Jail personnel and inmates did not amount to prejudice, the district court explicitly stated it "ha[d] reviewed the[] affidavits and considered [the] testimony coupled with the *entirety* of the evidentiary hearing" as well as "the *entirety* of the Dunlap resentencing and upon doing so th[e c]ourt [wa]s not convinced that the introduction of this evidence" "was of such importance as to undermine the [c]ourt's confidence in the outcome of the resentencing hearing." (Italics added.) The district court made the same type of statements when discussing the defense team's failure to adequately cross-examine and rebut Matthews: "The [c]ourt has had the benefit of reading and

considering the entire resentencing transcript. The [c]ourt has likewise had the benefit of reviewing and considering the evidence propounded by Dunlap at the evidentiary hearing . . . ."

The district court did not make such statements when discussing the defense team's failure to object to Matthews' bolstering statements; however, as discussed above, this Court already determined Matthews' improper bolstering was harmless and thus "did not contribute" to the imposition of Dunlap's death sentence. *See Garcia*, 166 Idaho at 674, 462 P.3d at 1138 (stating that a finding of harmless error required that this Court find that "the error *did not contribute* to the verdict rendered . . . .") (Italics added.)

In sum, we hold that the district court did not err when conducting the prejudice analysis under *Strickland* because it considered the impact the totality of the alleged ineffective acts by counsel.

## IV.    CONCLUSION

For the reasons stated above, we affirm the district court's dismissal of Dunlap's petition for post-conviction relief.

Chief Justice BEVAN, Justices BRODY, MOELLER, and SIMPSON, J. Pro Tem, CONCUR.

## DECISION ON REHEARING

STEGNER, Justice.

After we initially released this opinion, Dunlap petitioned this Court for rehearing on the *Brady* issue, arguing that we should not have considered the defense team's notes as the notes were not before the district court until the second evidentiary hearing, after the district court had already denied Dunlap's *Brady* claim. We granted rehearing and allowed the parties the opportunity to argue their respective positions. Having considered the issue, we decline to allow strategy to prevail at the expense of truth. In doing so, we reject Dunlap's claim that this Court should be precluded from considering evidence that bears on the merit of the *Brady* claim now on appeal. The parties agreed below to bifurcate the case into two evidentiary hearings: one for the *Brady*/*Napue* claim and one for the ineffective assistance of counsel claim. The parties were not required to do so, and defense counsel cannot now complain that their strategy did not yield the result they sought. Further, if we were to remand the *Brady* issue to the district court, nothing would prevent the district court from considering all the evidence it has already heard, including evidence from the second evidentiary hearing which clearly shows Dunlap's counsel were aware

34

of facts they claim were withheld by the prosecution. We decline to adopt a rule that would bar us from considering—on de novo review—evidence which a district court could freely consider on remand (which we could then consider on a subsequent appeal).

Chief Justice BEVAN, Justices BRODY, MOELLER, and SIMPSON, J. Pro Tem, CONCUR.